**Linda Carter GREENWAY**

v.

**INTERNATIONAL PAPER COMPANY and Jimmie D. Williams.**

**Civ. A. No. 91–0703.**

United States District·Court, W.D. Louisiana, Alexandria Division.

Oct. 27, 1992.

Miles E. Tilly, Lafayette, La., for plaintiff Greenway.

Gregory Guidry, Lafayette, La., for defendant Williams.

Timothy Burnham, Shreveport, La., for defendant International Paper.

## RULING

LITTLE, District Judge.

With good reason, International Paper and J.D. Williams moved to suppress and nullify the attempts by Linda C. Greenway to alter her deposition testimony. On 12 March 1992 the plaintiff's deposition was taken. In compliance with deponent's request, the deposition was sent by the court reporter to the plaintiff so that she could read and sign the deposition. The transcription of the deposition exceeded 200 typed pages.

█ The plaintiff made 64 corrections to the deposition. Defendants assert that the corrections exceeded the bounds permitted by Federal Rule of Civil Procedure 30(e). This court agrees with defendants and will not allow the alterations suggested by the plaintiff.

We have read all of the deposition and suggested changes. We will not repeat the verbosity employed by the plaintiff in her changes. We will, however, mention a few of her suggested alterations to demonstrate the problem with which we are dealing.

As stated in the deposition:

No, sir.

Correction desired:

Yes, sir.

As stated in the deposition:

One way or another. He gets his revenge.

Correction desired:

One way or another. He is very vindictive.

As stated in the deposition:

No, sir.

Correction desired:

Yes, sir. For example, after I filed the quick-hour grievance in June of 1990, Jimmy retaliated against me by forbidding me from using the telephone while at work, taking any jobs without his permission and talking to any management personnel without first talking to him. Additionally, there was a fourth step grievance meeting scheduled for 8:00 o'clock a.m., in connection with my quick-hour grievance. However, Jimmie failed to inform me about this this (sic) meeting; and, in particular, failed to inform me of the date and time set for said meeting. Mike Hamil had to call Jimmie around 8:15 o'clock a.m., and Jimmie had to come get me off my job. Jimmie then drove me to Mike Hamil's office, and he made it clear at that time that he was not at all happy with me. I believe that Jimmie deliberately did not tell me about this meeting.

As stated in the deposition:

Just—well, a lot of things went on during

Correction desired:

Jimmie was not my foreman during shutdown. Rather, Nubb Parker was my foreman at that time. However, a lot of things went on during

As stated in the deposition:

No, sir, I didn't check out everything. I didn't check out the four-wheel drive.

Correction desired:

From what I observed during the cursory inspection I was required to perform, the cherry picker appeared to be in good working order and there were no danger tags on it.

As stated in the deposition:

At one time there was a checklist, but we haven't used it in a long time.

Correction desired:

From what I recall, there was a checklist used approximately three or four years ago, which was given to a person going to operate a piece of equipment such as the cherry picker by that person's foreman when the foreman gave that person the keys to the particular piece of machinery. However, this checklist only required the person preparing to operate such a piece of machinery to perform the cursory inspection I mentioned above before using it. In particular, I recall that the checklist required the person going to operate the piece of machinery to check the oil and the fuel, to clean the windshield and to perform a visual inspection for damage to the machine such as broken hoses, belts, cables and to check for leaks. Finally, the person going to operate the piece of machinery was also required to check for any danger tags that may have been placed on the machinery by a former operator or a member of the rolling stock or garage crew.

As stated in the deposition:

Right outside the clarifier on the paved

Correction desired:

Right outside the clarifier on the dirt

As stated in the deposition:

On the east side. I didn't know how he

Correction desired:

On the south side, which was directly opposite from the way we normally approached the purchase chip blower motor. I didn't know how he

As stated in the deposition:

could engage it.

Correction desired:

could engage it. However, I also knew that if I did not immediately get the cherry picker to the purchase blower motor Jimmie would be coming into the area, and he would start hollering and screaming at me for holding up the crew. Consequently, I didn't really have any time to look for somebody to help me engage the four-wheel drive on the cher-

ry picker before driving it on the route given me by Jimmie to get to the south side of the purchase chip blower motor.

As stated in the deposition:

Well, it had to be over fifteen foot because the

Correction desired:

Well, it was approximately eight feet wide because the

As stated in the deposition:

on him.

Correction desired:

on him. Now, if you are asking me whether there was so much noise in the area outside the cab of the cherry picker that someone would have to holler and scream in order for someone else in that area to hear him, that is not correct. The noise levels in the area on the south side of the purchase chip blower motor where I was stuck are such that a person need only speak in a loud voice to make himself heard by someone else standing in that area. There was simply no need for Jimmie to be screaming and hollering as he was doing at this time.

As stated in the deposition:

down there.

Correction desired:

down there. We had never in the past used a procedure like the one Jimmie was making us use at this time where there was such a violent pulling and jerking on a slack cable strung between the front end loader and the cherry picker. In the past, when the cherry picker had gotten stuck in some other area, we had attached the front end loader to it with a cable. The front end loader would then move slowly forward until all of the slack was out of the cable. At that point, the operators of the front end loader and the cherry picker would gun the motors on those pieces of equipment and the cherry picker would come right out of the place where it was stuck. I cannot recall any such incident occurring before August 20, 1990, when it took as anymore than two or three gentle pulls to free the cherry picker, when it was

stuck in soft ground. I had never before been jerked around the inside of the cab of the cherry picker as I was on this occasion.

As stated in the deposition:

That's correct.

Correction desired:

That is not correct. I have already explained to you that I am convinced that Jimmie intended to injure me on August 20, 1990, based on his words and conduct before, during and after that incident. I have described Jimmie's words and conduct for you and there are many other incidents I could relate to you that occurred during the months prior to August 20, 1990. However, we would be here all day, if I were given the time to think of these incidents and describe all of them for you.

As stated in the deposition:

No, sir.

Correction desired:

Yes, sir. I recall Don Caraway and Don Bordelon who are both hourly employees calling me "dear". I asked both of them to quit calling me "dear", and they did. I also recall that some salaried employees such as Gene Jones and Nubb Parker also called me "dear" on one occasion. Again, I asked them not to do this and they never did it again. Finally, Clyde Ortego called me "sunshine" one time, and I asked him not to do that and he never did it again.

As stated in the deposition:

Well, I never have, so I can't brag about it.

Correction desired:

Well, I may have made a joke to that effect because all of the wood yard crew used to sleep for approximately fifteen minutes at lunch time in one of the motor control centers. However, we all had our separate spots where we slept, and no one slept close together. Certainly, no one engaged in sexual intercourse with me in the motor control center, which is what I believe you are referring to.

As stated in the deposition:

Correct.

Correction desired:

No, I do not consider what you have said to be correct.

In nearly every instance, plaintiff characterizes the reasons for each change as (1) her belief that the correction is a more accurate and complete answer or (2) that she subsequently recalled more accurate information or (3) that she wished to clarify her answer.

The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.

We order the changes deleted. The deposition of 12 March 1992 will be treated as if the plaintiff refused to sign the deposition or has waived the signing of the deposition. The court reporter shall certify in accordance with this order.

The court will take the request for sanctions under advisement.