Michael J. COLEMAN, Plaintiff,

v.

SOUTHERN PACIFIC TRANSPORTA-
TION CO., a Delaware corporation;
John and Jane Does I–X, Defendants.

No. CIV–96–1835–PHX–ROS.

United States District Court,
D. Arizona.

March 18, 1998.

Richard James Harris, Law Offices of
Richard J. Harris, Mesa, AZ, for Michael J.
Coleman.

Anthony J. Hancock, Terrance L. Sims,
Byrne, Beaugureau, Shaw, Zukowski & Han-
cock, Phoenix, AZ, for Southern Pacific
Transportation Company, John Does I–X,
Jane Does I–X, Defendants.

## ORDER

SILVER, District Judge.

## BACKGROUND

On July 17, 1996, Plaintiff Michael J. Cole-
man commenced this action against Southern
Pacific Transportation Company, a Delaware
corporation, in the Superior Court in Marico-
pa County alleging discrimination in violation
of the Americans with Disabilities Act
("ADA"), 42 U.S.C. §§ 12101–12213. Plain-
tiff's verified allegations are as follows.

On or about September 11, 1994, Defendant ran an advertisement that it was hiring train crew members.[1] (Compl.¶ 6.) The advertisement stated that the applicants were required to have good vision and perfect color perception.[2] *Id.* ¶ 7. Plaintiff had good vision and perfect color perception.[3] *Id.* ¶ 8. Plaintiff applied for the job and was eventually offered employment with Defendant as a train crew member. *Id.* ¶ 9. Defendant's representatives informed Plaintiff that the train crew member position would lead to a mandatory promotion to locomotive engineer.[4] *Id.* ¶ 10. After the employment offer was made and accepted, Defendant requested that Plaintiff undergo a physical examination by Defendant's physician. *Id.* ¶ 11. Plaintiff disclosed to Defendant's physician that he had vision in one eye only.[5] *Id.* ¶ 12. Defendant subsequently told Plaintiff that his lack of vision in one eye disqualified him from employment with Defendant.[6] *Id.* ¶ 13. Defendant revoked its offer of employment. *Id.* ¶ 14. Defendant did not conduct any additional tests to determine whether Plaintiff could perform the duties of the job for which he was hired. *Id.* ¶ 15. Plaintiff was at all times relevant able to perform the essential duties of the job for which Defendant offered him employment. *Id.* ¶ 16.

On August 9, 1996, Defendant removed the action pursuant to 28 U.S.C. § 1441(b).

On August 15, 1996, Defendant filed an Answer. Defendant admitted the following allegations that: (1) on or about September 11, 1994, Defendant ran an advertisement

---

1. In particular, Defendant contends that Plaintiff applied for a job as a switchman. (Def.'s Separate Statement of Facts ("SSOF") ¶ 2; Morgan Aff. ¶ 3.)

2. The complete requirements for the brakeman/switchman jobs listed in the advertisement are as follows:

 Must be in good physical condition. Must pass industrial physical exam which includes drug and alcohol testing. Must have good vision, good hearing, and perfect color perception. Must read and understand job information in English; communicate by speaking with co-workers, both in person as well as by phone and radio; must perform physical activities, must have learning and memory skills, problem solving skills, numerical skills. Should be able to use a computer keyboard terminal to retrieve information from transportation databases.

 (Def.'s SSOF Ex. A.) Defendant asserts that Plaintiff's monocular vision did not affect his ability to meet the general requirements of the switchman/locomotive engineer position. (Def.'s Mem. Supp. Summ. J. at 7.)

3. Defendant acknowledges that Plaintiff has good vision. (Def.'s SSOF ¶ 17.)

4. Defendant's Phoenix Trainmaster and hiring officer, William J. Morgan, has confirmed Plaintiff's allegation. (Def.'s SSOF ¶ 4; Morgan Aff. ¶¶ 4–5, 8.)

 Morgan claims that one of the essential functions of a locomotive engineer is to use depth perception:

 Locomotive engineers operate the controls of a locomotive, and are responsible for positioning and moving locomotives and train cars over the rail system. One of the essential functions of that position is to judge the distance between the locomotive and other objects, i.e. visually perceive depth, so that the engineer will be able to avoid collisions with those other objects, including pedestrians and vehicles at grade crossings.

 (Def.'s SSOF ¶ 6; Morgan Aff. ¶ 7.) Plaintiff objects to Morgan's averment based on lack of foundation, lack of relevance, and speculation. (Pl.'s Response to Def.'s SSOF ¶ 6(b).) Plaintiff claims that Morgan cannot competently testify on the effect that a lack of depth perception would have on performing the essential job functions of a locomotive engineer. *Id.* Plaintiff relies upon the following excerpt from Morgan's deposition to illustrate his lack of qualification to testify:

 Q Any other situation you can think of where monocular vision would affect somebody's ability to be an engineer?

 A I'm not sure how that would affect an engineer, to be honest with you.

 (Morgan Dep. at 40.) Defendant's position has been all along that an individual with monocular vision lacks adequate depth perception to function as a locomotive engineer. If Morgan cannot recognize how monocular vision affects a person's ability to be a locomotive engineer, then Morgan either does not understand the essential job functions of a locomotive engineer or does not believe that an individual with monocular vision is incapable of functioning as a locomotive engineer.

5. Defendant concedes that Plaintiff has vision in only one eye. (Def.'s SSOF ¶ 17.)

6. Defendant contends that Dr. Calvin Boyd Benton, employed as a reviewing physician in Defendant's Medical Department, determined that Plaintiff's lack of vision in one eye disqualified him from employment as a switchman or locomotive engineer upon reviewing the report of Plaintiff's physical examination. (Def.'s SSOF ¶ 9; Benton Aff. ¶¶ 2–4.)

that it was hiring train crew members; (2) the advertisement stated that the applicants were required to have good vision and perfect color perception; (3) Defendant required Plaintiff to undergo a physical examination by Defendant's physician; and (4) Defendant subsequently told Plaintiff that his lack of vision in one eye disqualified him from employment with Defendant.

On May 15, 1997, Defendant moved for summary judgment for failure to state a claim upon which relief may be granted. Defendant contends that Plaintiff is not entitled to protection under the ADA because he does not have a disability within the meaning of the ADA. Defendant argues that the issue of whether Plaintiff has a disability can be resolved as a matter of law because the undisputed material facts show that Plaintiff's monocular vision (i.e., vision in only one eye) does not substantially limit him in any major life activity such as working. (Def.'s Mem. Supp. Summ. J. at 4.) Defendant does not dispute that Plaintiff has a physical impairment (i.e., lack of vision in his right eye) and that Defendant refused to hire him as a switchman because of his impairment. *Id.* at 3–4.

On July 15, 1997, Plaintiff responded in opposition to Defendant's summary judgment motion and filed a Cross-motion for Partial Summary Judgment on the issue of whether he has a disability.[7]

On August 11, 1997, Defendant filed a reply in support of its summary judgment motion and a response to Plaintiff's Cross-Motion for Partial Summary Judgment. On September 8, 1997, Plaintiff filed a reply in support of its cross-motion.

Oral argument on Defendant's motion was conducted on February 17, 1998.

### DISCUSSION

The issue presented is whether Plaintiff suffers from a "disability" within the meaning of the ADA.

The ADA's general rule states as follows:

No covered entity shall discriminate against a qualified individual with a *disability* because of the *disability* of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a) (emphasis added). The term "disability" is defined in the ADA as follows:

(A) a *physical* or mental *impairment* that *substantially limits* one or more of the *major life activities* of such individual;

(B) a record of such an impairment; or

(C) being *regarded as* having such an impairment.

42 U.S.C. § 12102(2) (emphasis added).

### I. Physical or Mental Impairment that Substantially Limits One or More of the Major Life Activities

#### A. Physical Impairment

It is undisputed that Plaintiff has a physical impairment because he has no sight in his right eye. (Coleman Aff. ¶¶ 2, 4.) The Equal Employment Opportunity Commission's ("EEOC") regulations indicate that a physical impairment includes any physiological disorder, condition, cosmetic disfigurement, or anatomical loss affecting "special sense organs." 29 C.F.R. § 1630.2(h)(1).

#### B. Substantially Limits One or More of the Major Life Activities

Defendant contends that Plaintiff's monocular vision did not significantly restrict him from the major life activity of *working* . In particular, Defendant claims that Plaintiff's impairment did not significantly restrict him from a "class of jobs" utilizing similar training, knowledge, skills, or abilities and did not significantly restrict him from a "broad range of jobs in various classes."

---

7. The Court recognizes that neither party has moved for summary judgment on the other *prima facie* elements of an ADA claim. That is, neither party has moved for summary judgment on whether Plaintiff is qualified or able to perform the essential functions of the job and whether he

suffered an adverse employment action because of his disability. *See Sanders v. Arneson Products, Inc.*, 91 F.3d 1351, 1353 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997).

(Def.'s Mem. Supp. Summ. J. at 8.) In contrast, Plaintiff claims that his monocular vision substantially limits his major life activity of *seeing*.

 The EEOC regulations define the term "major life activities" as follows:

Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, *seeing*, hearing, speaking, breathing, learning, and *working*.

29 C.F.R. § 1630.2(i) (emphasis added). The term "substantially limits" is generally defined in the EEOC regulations as follows:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i)-(ii). Factors to consider in determining whether a disability has substantially limited a major life activity include:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). "The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." 29 C.F.R. pt. 1630, app. § 1630.2(j). "The determination of whether the individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices." *Id.; Holihan v. Lucky Stores, Inc.*, 87 F.3d 362, 366 (9th Cir.1996) ("Under EEOC regulations, we are not to consider mitigating measures in determining whether an individual is disabled."),

*cert. denied,* ── U.S. ──, 117 S.Ct. 1349, 137 L.Ed.2d 506 (1997).

## 1. The Nature and Severity of the Impairment

One of the factors to consider in determining whether a disability has substantially limited a major life activity is the nature and severity of the impairment. 29 C.F.R. § 1630.2(j)(2). As stated above, Plaintiff is blind in his right eye. (Coleman Aff. ¶ 2.) As a result of his partial blindness, Plaintiff avers in his sworn affidavit that he is "unable to see out of both eyes or see peripherally from both eyes or perceive depth three-dimensionally." (Coleman Aff. ¶ 4.) Defendant admits Plaintiff's averments. (Def.'s Response to Pl.'s Statement of Additional Facts ("SOAF") ¶ 23.) Plaintiff has also proffered evidence that he has been denied certain employment opportunities as a direct result of his monocular vision. (Coleman Aff. ¶¶ 6–7.) In particular, Plaintiff avers that he was denied a position as a nuclear propulsion specialist in the United States Navy as a result of his monocular vision. *Id.* ¶ 6. Plaintiff also avers that he was denied entry into the United States Air Force because of his monocular vision. *Id.* ¶ 7. Defendant admits Plaintiff's averments. (Def.'s Response to Pl.'s SOAF ¶¶ 46–47.) Further, Plaintiff asserts that his monocular vision has otherwise limited him in that restrictions have been placed on his Arizona commercial driver's license. (Coleman Aff. ¶ 9.) Plaintiff avers that the State of Arizona prevents him from transporting passengers and certain amounts of hazardous material because of his monocular vision. *Id.* ¶ 8. Once again, Defendant admits Plaintiff's allegations. (Def.'s Response to Pl.'s SOAF ¶¶ 48–49.)

The loss of peripheral vision and depth perception are serious consequences affecting one's ability to see. It is undisputed that the average person in the general population has both peripheral vision and depth perception. Defendant's Director of Medical Services Department, Patricia A. Boynton, testified at her deposition that peripheral vision and depth perception are attributes of vision. (Boynton Dep. at 93.) Boynton further testified that somebody who does not have depth

perception or has reduced depth perception and peripheral vision would be impaired in their sight. *Id.* Finally, Boynton conceded that the loss of depth perception and peripheral vision is a *significant* impairment on a person's ability to see. *Id.* at 93–94.

Although Defendant responds by claiming that Boynton subsequently corrected her statement in an errata sheet by *replacing* it with a less damaging statement, (Def.'s Response to Pl.'s Mem. Supp. Part. Summ. J. at 7), Plaintiff has proffered case authority indicating that even if deposition testimony is corrected, a court need not disregard the deponent's original answers. *See Greenway v. International Paper Co.,* 144 F.R.D. 322, 325 (W.D.La.1992) ("The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error ..., then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination."); *Rios v. Welch,* 856 F.Supp. 1499, 1502 (D.Kan.1994) ("It is the court's belief that a plaintiff is not permitted to virtually rewrite portions of a deposition ... simply by invoking the benefits of Rule 30(e). As the court stated in its previous order, a deposition is not a 'take home examination' and an 'errata sheet' will not eradicate the import of previous testimony taken under oath ."), *aff'd,* 67 F.3d 1543 (10th Cir.1995); *Wiley v. Brown,* 164 F.R.D. 547, 549 (D.Kan.1996) (citing *Greenway* and *Rios*). In addition, to the extent that this issue is governed by the Ninth Circuit's rule regarding the creation of an issue of fact through a party's contradictory testimony, the Court finds that Boynton's wholesale changes to material portions of her deposition testimony through an errata sheet constituted a sham. *See Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 267 (9th Cir. 1991); *Radobenko v. Automated Equip., Corp.,* 520 F.2d 540, 544 (9th Cir.1975).

In addition, though Plaintiff has been to some extent able to mitigate the restriction on his peripheral vision and the complete absence of three-dimensional depth perception by using more frequent head movements and eye scanning and by relying on his experience to judge distance, respectively, (Coleman Aff. ¶ 5), the Ninth Circuit has instructed courts not to consider mitigating measures in determining whether an individual is disabled. *See Holihan,* 87 F.3d at 366. Thus, Plaintiff's ability to mitigate the effects of his impairment cannot be considered in determining the severity of his impairment. Based on the demonstrated effect that Plaintiff's impairment has had on his life and, in particular, on his ability to find employment, the Court finds that Plaintiff's impairment is both severe and has substantially limited his ability to see.

Further, while Defendant relies heavily on Plaintiff's verified statement in his Complaint that he has "good vision," (Compl.¶ 8), in support of the proposition that Plaintiff had made an admission that his impairment has not significantly impaired his ability to see, the Court's disagrees with Defendant's reliance on Plaintiff's statement. Plaintiff's statement that he has "good vision" was obviously made in response to the inclusion of "good vision" as an explicit requirement in Defendant's job advertisement for the switchman/locomotive engineer positions. (Pl.'s SOAF Ex. 1.) The term "good vision," however, is not defined in Defendant's job advertisement and is ambiguous. In addition, while Plaintiff testified at his deposition that "good vision" means that he can see well, (Coleman Dep. at 19), Plaintiff has elsewhere explained that "good vision" is merely that which is sufficient to operate a train under the requirements set forth by the Federal Railroad Administration ("FRA"). (Pl.'s Reply Mem. Supp. Part. Summ. J. at 4.) The FRA's regulations on visual acuity requirements for locomotive engineers make no reference to depth perception. 49 C.F.R. § 240.121(c). Thus, it is not inconsistent for Plaintiff to claim that he has "good vision" that is sufficient to satisfy the FRA requirements to serve as a locomotive engineer and to also claim that his ability to see is substantially limited.

Indeed, even if there was a depth perception requirement set forth in the FRA's reg-

ulations, Plaintiff's contention that he has "good vision" would still not be inconsistent with his claim that he is disabled under the ADA. The FRA's regulation on visual acuity of locomotive engineers sets forth an exception for individuals who do not satisfy the FRA's visual acuity requirements. The exception states as follows:

> A person not meeting the thresholds in paragraphs (c) and (d) of this section may be subject to further medical evaluation by a railroad's medical examiner to determine that person's ability to safely operate a locomotive. If the medical examiner concludes that, despite not meeting the threshold(s), the person has the ability to safely operate a locomotive, the person may be certified as a locomotive engineer and such certification conditioned on any special restrictions the medical examiner determines in writing to be necessary.

49 C.F.R. § 240.121(e). Under this exception, a prospective locomotive engineer who does not satisfy the threshold requirements under the regulation can still be certified to operate a locomotive after a further medical evaluation. Plaintiff's reference to his "good vision" must be construed within the context that he need not satisfy the threshold requirements set forth in the FRA's regulation in order to be certified. Taken in this light, Plaintiff's reference to his "good vision" is not inconsistent with his claim of disability.

Defendant also relies upon Coleman's deposition testimony as follows:

> Q. Okay. Is there anything that you want to do that you can't see well enough to do?
>
> MR. HARRIS: Objection; vague, overbroad.
>
> THE WITNESS: Not that I'm—I mean, not that I can think of at this point.

(Coleman Dep. at 19.) Plaintiff, however, responds by noting that subsequently in his deposition he declined to agree with Defense counsel that he was not substantially limited in his ability to see. *Id.* at 20. Plaintiff testified that though he felt that he could see fine, he recognized that he had vision limitations that he lived with. *Id.*

The Court finds that the effect of Plaintiff's impairment on his particular life has been severe.

**2. The Duration or Expected Duration of the Impairment**

It is undisputed that Plaintiff will be blind in his right eye for the rest of his life. (Coleman Aff. ¶ 2; Def.'s Response to Pl.'s SOAF ¶ 21.) Thus, Plaintiff's impairment is permanent.

**3. The Permanent or Long Term Impact, or the Expected Permanent or Long Term Impact of or Resulting From the Impairment**

Although the long-term impact of Plaintiff's impairment is not easy to predict, some guidance may be gleaned by evaluating the impact that the impairment has already had on Plaintiff's life. As mentioned earlier, Plaintiff has been denied employment opportunities in the United States Navy and Air Force as a result of his impairment. (Coleman Aff. ¶¶ 6–7.) Indeed, Plaintiff was completely denied entry into the Air Force regardless of the type of job duties he may have been assigned to perform. *Id.* ¶ 7. Plaintiff's Arizona commercial driver's license has been restricted to the extent that he is unable to transport passengers and certain amounts of hazardous waste. *Id.* ¶ 8. The restrictions on Plaintiff's driver's license obviously affect his employment opportunities. One can reasonably infer that the restrictions disqualify Plaintiff from working as a school bus driver, an airport shuttle bus driver, a taxi driver, and a limousine driver. Plaintiff's ability to find work as a trucker has also been limited because he cannot transport placarded amounts of hazardous materials/waste. Based on the evidence in the record, the long-term impact of Plaintiff's impairment appears to be significant.

**C. Relevant Case Authority**

Two recent cases are directly on point because they address the issue of whether an individual with monocular vision has a disability within the meaning of the ADA. In *Doane v. City of Omaha,* 115 F.3d 624 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118

S.Ct. 693, 139 L.Ed.2d 638 (1998), the Eighth Circuit held that a former police officer who was permanently blind in one eye and had reapplied unsuccessfully for that position was an individual with a disability within the meaning of the ADA.

In contrast, in *Still v. Freeport–McMoran, Inc.*, 120 F.3d 50 (5th Cir.1997), the Fifth Circuit held that a safety equipment and warehouse clerk working for a petroleum exploration company who was blind in one eye was not legally disabled under the ADA.

The Court finds that the better-reasoned and more persuasive case is *Doane*. In *Doane*, the Eighth Circuit held as follows:

> We conclude that Doane is an individual with a disability within the meaning of the ADA. His glaucoma caused permanent blindness in one eye which substantially limits Doane's major life activity of seeing. *The manner in which Doane must sense depth and use peripheral vision is significantly different from the manner in which an average, binocular person performs the same visual activity. Doane's brain has mitigated the effects of his impairment, but our analysis of whether he is disabled does not include consideration of mitigating measures. His personal, subconscious adjustments to the impairment do not take him outside of the protective provisions of the ADA.*

115 F.3d at 627–28 (emphasis added). *Doane* is significant because it is the only published opinion that this Court has been able to locate that carefully analyzes the actual medical effects of monocular vision on a person's major life activity of seeing. *Doane* confirms Plaintiff's contentions that he has learned to adapt to his lack of depth perception and loss of peripheral vision in that "his brain has learned to work with environmental clues to develop his own sense of depth perception using only one eye and that he has learned to compensate for his loss of peripheral vision by adjusting his head position." *Id.* at 627. *Doane* is also significant because the Eighth Circuit held that a monocular person had a disability regardless of whether his corrected vision was 20/20. *Id.* The Ninth Circuit and the Eighth Circuit both exclude mitigating measures from the analysis of whether a

person is disabled. *See id.; Holihan,* 87 F.3d at 366; *see generally Arnold v. United Parcel Serv., Inc.,* 136 F.3d 854, 865 (1st Cir.1998) ("the majority of federal circuit courts that have considered this issue have followed the EEOC interpretation that ameliorative measures should not be considered in determining whether an impairment substantially limits an individual's major life activities"); *Sutton v. United Air Lines,* 130 F.3d 893, 901 (10th Cir.1997) (noting the split in the circuits). In contrast, the Fifth Circuit takes mitigating factors into consideration in evaluating whether an individual is disabled. *See Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 191–92 n. 3 (5th Cir.1996) (noting that "had Congress intended that substantial limitation be determined without regard to mitigating measures, it would have provided for coverage under § 12102(2)(A) for impairments that have the potential to substantially limit a major life activity"); *Chandler v. City of Dallas,* 2 F.3d 1385, 1390 (5th Cir.1993) ("This court has previously held that a person is not handicapped if his vision can be corrected to 20/200."), *cert. denied,* 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994). The Fifth Circuit's reliance upon mitigating measures appears to have influenced its determination in *Still* that an individual with monocular vision does not have a disability. In particular, the court's reliance upon the normal functioning of the monocular person's remaining eye may be construed as reliance upon a natural or innate mitigating measure of the brain. *Still,* 120 F.3d at 52. Under the Ninth Circuit standard, it is inappropriate to rely upon the functioning of the remaining eye of a monocular person.

Further, the Fifth Circuit decided *Still* without evidentiary support for the monocular person's disability claim. *Id.* Indeed, the Fifth Circuit did not even mention or consider the effect of monocular vision on depth perception, which is at the heart of the instant case. In contrast, the record support for the instant action is stronger.

## D. Conclusion

Overall, Plaintiff has demonstrated that his vision has been significantly restricted in the "condition, manner or duration" under which

he can perform the major life activity of seeing "as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii); *see Doane,* 115 F.3d at 627. Plaintiff has come forward with evidence regarding the negative effect of his visual impairment on his own life. The Court finds that Plaintiff is disabled as a matter of law.

## II. Record of Impairment

Because Plaintiff does not rely upon any medical record or history of his past impairment as a basis for finding ADA disability, this factor is irrelevant to the instant action.

## III. Being Regarded as Having a Substantial Impairment

■ Plaintiff also claims that he is disabled because he was regarded by Defendant as having a substantial impairment.

One is regarded as having a "substantially limiting" impairment if the individual:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraphs (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(*l*). Plaintiff relies upon the first two factors of the test.

### A. Does Plaintiff Have a Physical or Mental Impairment that Does Not Substantially Limit His Major Life Activities, But Is Treated by a Covered Entity as Constituting such Limitation?

The term "substantially limits" is defined with respect to the major life activity of *working* as:

significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. *The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.*

29 C.F.R. § 1630.2(j)(3)(i) (emphasis added).

Defendant claims that it perceived Plaintiff's monocular vision as significantly restricting only his ability to work as a train crew member who later would have to be certified as a locomotive engineer. (Def.'s Mem. Supp. Summ. J. at 8.) That is, Defendant argues that it perceived Plaintiff's impairment as disqualifying him from *specific positions* only and not a particular job or type, class, or range of jobs. *Id.* at 9. Defendant characterizes the circumstances surrounding its perception that Plaintiff should be disqualified from the specific positions of switchman and locomotive engineer as "unique." *Id.* at 8. Defendant explains that though it still retains and employs locomotive engineers who have monocular vision and who entered into service prior to the 1991 implementation of a federal regulatory scheme requiring certification of all locomotive engineers for visual acuity, *see* 49 C.F.R. § 240.121, new applicants for the switchman and locomotive engineer positions who have monocular vision are disqualified because they cannot take a field test administered to determine whether their monocular vision affects their depth perception to such a degree that it prevents them from operating trains safely, (Def.'s Mem. Supp. Summ. J. at 9). Defendant argues that the reason monocular applicants cannot take a field test is that they do not know the job duties of a locomotive engineer.[8] *Id.* at 3 ("the applicants did not know how to operate a locomotive or perform the other essential functions of a locomotive engineer").

---

**8.** Defendant's assertion that it cannot issue field tests on prospective locomotive engineer candidates begs the question of why it could not wait until its trainees with monocular vision had completed enough of their training to permit them to take the field test. Curiously, Defendant's field test explanation was not included in the detailed letter to Plaintiff dated June 29, 1995 from Defense counsel explaining the reasons he was not hired. Defendant's explanation is unconvincing.

Plaintiff relies upon a letter dated June 29, 1995 from Defendant's in-house counsel, Wayne M. Bolio, to Plaintiff's counsel explaining the reasons Defendant did not employ Plaintiff. Although the letter focuses on the requirements of the positions of trainman/switchman and locomotive engineer, the letter's applicability cannot be limited to those positions alone. To illustrate, the letter indicates that Plaintiff's monocular vision prevented him from working in a "railroad environment" or railroad yard or working on or around or in close proximity to moving railroad equipment. (Letter dated June 29, 1995 at 1–2; Pl.'s SOAF Ex. 4.) The letter's applicability extends to "train and/or engine service" positions. (Letter dated June 29, 1995 at 2.) Moreover, the letter says nothing about Plaintiff's inability to take a field test due to his lack of knowledge of how to operate a locomotive.

The concern expressed in Mr. Bolio's letter regarding the safety of individuals with monocular vision in a "railroad environment" is confirmed by the deposition testimony of Defendant's Phoenix Trainmaster, William J. Morgan. Morgan testified that an individual with monocular vision would be a danger to herself around moving railroad cars. (Morgan Dep. at 34–35; Pl.'s SOAF Ex. 3.) Morgan explained that anyone with monocular vision working in the railroad yard as a switchman, brakeman, or conductor or in the entire class of transportation jobs would be at risk of being stricken by a moving railroad car. *Id.* at 40–41.

Patricia A. Boynton, Defendant's Director of Medical Services Department, testified that the jobs in Defendant's transportation department constitute the largest class of employees in Defendant's company. (Boynton Dep. at 64.) Boynton also echoed Morgan's concern that Plaintiff could have been a safety hazard to himself had he been hired. *Id.* at 94–95. Boynton further testified that her own concerns about Plaintiff's personal safety extended beyond the switchman or locomotive engineer positions to conductor and brakeman positions and other jobs within the transportation class. *Id.* at 94–98.

In addition, Defendant has admitted that: (1) Defendant felt that monocular vision would affect somebody's ability to be a switchman, brakeman, conductor, or any other railroad yard job; and (2) the ability to work in the entire class of transportation jobs would be affected by monocular vision. (Def.'s Response to Pl.'s SOAF ¶ 19(b).)

As mentioned earlier, though Defendant claims that Plaintiff's reliance upon Boynton's deposition testimony is misplaced because she subsequently corrected her testimony in an errata sheet to reflect more complete answers, (Def.'s Response to Pl.'s Mem. Supp. Part. Summ. J. at 7), Plaintiff has proffered case authority indicating that a change in a deposition statement does not eradicate the deponent's original answers, (Pl.'s Reply Mem. Supp. Part. Summ. J. at 6); *see Greenway,* 144 F.R.D. at 325; *Rios,* 856 F.Supp. at 1502; *Wiley,* 164 F.R.D. at 549.

Plaintiff has proffered sufficient evidence to indicate that Defendant viewed his impairment as restricting his ability to perform either a class of jobs or a broad range of jobs in various classes. Specifically, Defendant appears to have viewed Plaintiff's impairment as precluding him from working in an environment in which mobile forms of equipment could injure Plaintiff. Plaintiff has demonstrated that Defendant treated his impairment as constituting a substantial limitation on his major life activity of working.

Defendant's reliance upon *Bridges v. City of Bossier,* 92 F.3d 329 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 715 (1997), is misplaced. In *Bridges,* an applicant for a firefighter position sued Bossier City, Louisiana under the ADA after he was disqualified once the City found out that the applicant had a mild form of hemophilia. The City responded to the lawsuit by arguing that it did not regard the applicant as having a "disability" within the meaning of the ADA. The Fifth Circuit agreed with the district court that jobs involving routine exposure to extreme trauma, such as firefighting, constitute a narrow range of jobs and held that those who are disqualified from holding such jobs are not disabled under the ADA. *Id.* at 334. Unlike the situation in *Bridges,* Defendant appears to regard Plaintiff as disqualified from the

entire transportation class of jobs to the extent that Plaintiff may come in contact with moving vehicles or equipment. Defendant perceives safety risks to an individual with monocular vision in not only the locomotive engineer and switchman positions, but also in the conductor and brakeman positions. Defendant's perception of Plaintiff's impairment restricts Plaintiff's access to a greater number of jobs than in *Bridges*.

**B. Does Plaintiff Have a Physical or Mental Impairment that Substantially Limits His Major Life Activities Only as a Result of the Attitudes of Others Toward such Impairment?**

Plaintiff claims that he has been denied work opportunities by Defendant and other potential employers because of a blanket prejudice regarding his monocular vision. Plaintiff has asserted all along that his vision does not affect his capacity to perform all jobs. (Coleman Dep. at 19.)

As mentioned earlier, Plaintiff has cited several portions of the testimony of Defendant's officials, which reveal that they believe that Plaintiff is unsuitable to work in the transportation class of jobs (i.e., in or about the railroad yard) because of his monocular vision. The Court finds the existence of a disability because Defendant *regarded* Plaintiff as having a "substantially limiting" impairment. *See Doane,* 115 F.3d at 627 ("Police Chief Skinner testified that he perceived Doane's visual problem as a significant limitation and that this was the reason he recommended rejecting Doane's employment application. Thus, the evidence demonstrates that the city perceived Doane as having a disability that substantially limited his ability to see.").

The Court finds that Plaintiff is disabled because Defendant regarded him as having a "substantially limiting" impairment.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. # 11) is denied.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. # 18) is granted.