| iNORRIS, Judge.
These three suits arise out of an accident in which an 18-wheel rig fell over while emptying a load of contaminated dirt at the Woolworth Road Landfill in Shreveport. The cases were consolidated in the District Court and remain so on appeal. The District Court found the driver of the rig, Mullen Sullivan, and the operator of the landfill, Browning-Ferris Industries (“BFI”), each 50% at fault in causing the accident. The court fixed damages and rendered judgment on all claims accordingly. Sullivan and his wife have appealed devolutively; BFI has *170 appealed suspensively; and other parties have either answered or filed briefs. For the reasons expressed, we affirm.

Factual background

The accident occurred late on the afternoon of December 11, 1991, a gray and drizzly day. Sullivan, a 54-year-old truck driver employed by Brewer Trucking and leased to W.P.I. Trucking, was the middle driver in a three-truck convoy hauling contaminated dirt from Houston to the Woolworth Road Landfill. The drivers arrived shortly before the posted closing time of 5:30 p.m. and were admitted; however, after paperwork, weighing and testing, Sullivan was not allowed into the dump cells until nearly 6:00 p.m. He testified that because it had been raining, the gravel road leading to the cells was rutted, wet, and had at least one large, cordoned-off pothole to drive around. The sky was dark by then, but most witnesses stated that there was generous artificial lighting.
When Sullivan reached his cell, he thought he could drive up the incline to the flat area on top. However, Barrett Branch, a BFI bulldozer driver, offered to tow him up, and Sullivan accepted. Sullivan and Branch dispute which of them detached the tow line from Sullivan’s tractor. They agree, however, that Branch pulled Sullivan to the spot where he expected Sullivan to dump his dirt, and Sullivan understood he was spotted to dump there. Branch testified that he had lal'ust compacted and leveled the area, but it was still somewhat damp from the persistent rain.
Sullivan testified that once he was spotted, he properly locked his trailer brakes and unlocked the tractor brakes; got out and removed the “dump pin” on the trailer; then got back in the cab and started the hydraulic lift. By this time Branch, who had momentarily disappeared, was directly in front of the truck, glaring his lights directly into Sullivan’s face. Sullivan opened his door, put one foot on the running board, and craned his neck around to watch the dumping process. The trailer got about 5-6 feet over the top of the tractor when suddenly Sullivan realized something was wrong. Within two seconds the trailer fell on its right side, striking the tractor; Sullivan either jumped out the open door, or was thrown, and landed in a trench.
Sullivan testified that his right rear trailer wheel must have sunk into the dirt at least three inches; this is enough to throw the rig off balance. He also testified he had been spotted on an incline, causing him to lean over. BFI personnel, however, said the site was level. The landfill supervisor, Gary Iv-erson, testified that when he arrived on the scene moments after the accident, Sullivan claimed the spotter had parked him in a hole. Sullivan denied saying this, yet Iverson and BFI personnel said they examined the ground and saw no holes around Sullivan’s rear wheels. Iverson also took some photos of the scene; these show tire tracks but no holes or trenches.[1]
At the scene Sullivan did not tell anyone that he was hurt. He did report back pain to Brewer when he phoned him later that night, and he asked someone at BFI for an aspirin the next morning. He had to wait in Shreveport for about ftfour days until the rig was towed away, and then he “hitched a ride” with another trucker and did not get back home to Amite, in southeast Louisiana, until a few days later. The very next day he went to a doctor, whose name he could not recall, in Covington and reported low back pain. His first documented medical attention was to see a neurosurgeon, Dr. Gutnisky, on January 3, about three weeks after the accident. Dr. Gutnisky diagnosed a herniated L4-5 disc, which he related to the accident and expected to cause permanent disability. Dr. Gutnisky saw Sullivan a total of four times, lastly in April 1992, when he complained for the first time of a swollen left knee.
Sullivan next went to an orthopedic surgeon, Dr. Billings, who had previously operated on him for a work-related upper back *171 injury in 1979.[2] Dr. Billings initiated conservative treatment of the back in July 1992. In September, Sullivan complained to him for the first time about left knee pain. One of Dr. Billings’s colleagues, Dr. Meyer, performed arthroscopic surgery to repair a tom plica in Sullivan’s left knee in March 1993. Dr. Billings testified that Sullivan can expect intermittent knee pain for the rest of his life.
Meanwhile, continued conservative treatment of Sullivan’s back proceeded without apparent success. In March 1994, Dr. Billings performed a spinal fusion. Although the operation was fairly successful, Dr. Billings assessed a permanent 35% whole-body disability and imposed severe restrictions on Sullivan’s activity.
Still later, in January 1995, Sullivan complained to Dr. Billings that he had suffered from impotence ever since the accident. A urologist, Dr. Swartz, found a prostate infection, which was treated and cured without restoring sexual function. Dr. Swartz said he could find no other cause for the condition except the accident. The only effective remedy available at the time was a direct injection of Uprostaglandin, but neither Sullivan nor his wife is able to give him the shot.
At the time of trial in January 1997, Sullivan was 59 years old and in fairly constant back pain. He reads at the first-grade level and has spent most of his life working carpentry and driving tracks. A rehabilitation counselor, Dr. Galloway, testified that his chances of rehabilitation or future employment were remote. An economist, Dr. Har-ju, estimated Sullivan’s lost past wages and projected his lost future earnings.

Procedural background

Three suits were filed. Brewer and his collision carrier, Fireman’s Fund, sued BFI to recover damages to the truck and trailer; W.P.I.’s comp carrier, Hartford, sued BFI, its insurer and the City of Shreveport to recover medical and indemnity benefits paid to Sullivan under workers comp; these amounts were stipulated at trial. Sullivan and his wife sued the City,[3] BFI and its insurer for personal injury, loss of consortium, lost wages and future medicals. As noted, all three suits were consolidated and trial held in January 1997. The District Court rendered a written opinion in April 1997.
The court noted that prior to the accident, neither Branch nor Sullivan thought the area was unstable or unlevel. The court found that because Branch had just been working the surface, he should have known of its condition; and because Sullivan bears the ultimate responsibility for placing his truck, he was negligent for not adequately assuring that his spot was safe. The court therefore found each 50% at fault. The court attributed the low back injury, knee injury and sexual dysfunction to the accident; he awarded lump sum general damages of $175,000. He also awarded future medicals totaling $93,212, including elements for future surgery, physical therapy and prescriptions. The court, accepted Dr. 15Harju’s estimate of Sullivan’s past lost wages, $136,388, but reduced the estimate of future lost wages to $68,711, stating that with Sullivan’s prior health condition and work record, he would not likely have worked past age 62. The court awarded Mrs. Sullivan $30,000 for loss of consortium. The court finally awarded Fireman’s Fund, Brewer and Hartford their stipulated property and insurance losses. All awards were reduced by 50%. Judgment to this effect was rendered in June 1997. • ■
As noted, the Sullivans .have appealed de-volutively, raising six assignments of error. BFI has appealed suspensively, raising three assignments. Fireman’s Fund and Brewer have answered, aligning themselves with the Sullivans in urging that all fault should be assigned to BFI; Hartford has not answered the appeal, but has filed a brief arguing that BFI’s fault should be increased. The City has also filed a brief, urging affirmance of its dismissal from the suit.

*172
Applicable law

In negligence cases, a duty-risk analysis regulates the finding of liability. The plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of the protection afforded by the duty breached. Syria v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173, and citations therein. In strict liability cases, the analysis hinges on proof of a defect in the premises that poses an unreasonable risk of harm. Reed v. Wal-Mart Stores Inc., 97-1174 (La.3/4/98), 708 So.2d 362.
A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong. LeJeune v. Union Pacific R., 97-1843 (La.4/14/98), 712 So.2d 491; Stobart v. State, 617 So.2d 880 (La.1993). A two-part test is utilized. The court of appeal may reverse the district court only if (1) it finds from the record that a reasonable factual basis | (¡does not exist for the finding, and (2) it further determines that the record establishes that the finding is clearly wrong or manifestly erroneous. Id. The inquiry is not whether the fact finder was right or wrong, but whether its conclusions were reasonable; as long as they are, the court of appeal must not reverse, even if it feels it would have weighed the evidence differently. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). Manifest error also governs findings of defect for purposes of strict liability. Reed v. Wal-Mart, supra.
If a person suffers injury, death or loss as the result partly of his own negligence, and partly as a result of the fault of another person or persons, then the plaintiff’s recoverable damages shall be reduced in proportion to the degree or percentage of his own fault. La. C.C. art. 2323 A. The district court’s allocation of fault, like its other factual findings, is subject to the manifest error rule. Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607; Socorro v. City of New Orleans, 579 So.2d 931 (La.1991); Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La. App. 2 Cir.1984). In assessing comparative fault, courts consider various factors: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm, 469 So.2d 967 (La.1985).
In the assessment of damages in cases of offenses, quasi offenses and quasi contracts, much discretion must be left to the judge or jury. La. C.C. art. 2324.1; Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). The appellate court’s role is not to decide what it considers to be an “appropriate” award, but to review the exercise of discretion by the district court. Reck v. Stevens, 373 So.2d 498 (La.1979). Because each case is different, the appellate 17court must first find a manifest abuse of discretion before comparing the award to other reported cases with “generieally similar medical injuries.” Hae Woo Youn v. Maritime Overseas Corp., supra.
The amendment and signing of depositions is regulated by La. C.C.P. art. 1445, which provides in part:
When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by him, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness unless the parties by stipulation waive the signing or the witness is ill or absent * * ⅜ or refuses to sign. If the deposition is not signed by the witness within thirty days of its submission to him, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the *173 deposition may then be used as fully as though signed * ⅜ *.
The admission of a deposition not signed by either the deponent or the court reporter may be harmless error. McCoy v. Winn-Dixie of La. Inc., 95 1214 (La.App. 1 Cir. 4/4/96), 672 So.2d 312.

Discussion: Allocation of fault

By their first four assignments of error the Sullivans urge the District Court was plainly wrong to find Sullivan 50% comparatively negligent in the accident. They contend that all fault should be assigned to BFI because its employee, Branch, knew or should have known that the soil was unstable and should not have spotted Sullivan there. They further argue that had BFI provided a “trained, designated spotter,” instead of a dozer operator, the accident would not have occurred.[4] Fireman’s Fund and Hartford concur in this argument. To the | ^contrary, BFI’s first assignment urges that Sullivan had the ultimate responsibility to check his spot and empty his load properly; contending that he breached both of these duties, BFI contends all fault should be assigned to Sullivan.
The Sullivans correctly note the District Court’s specific finding that Branch best knew the condition of the soil as he had prepared and selected the location to unload. The record shows that BFI owed the contractual duty to “thoroughly spread and compact” all solid waste “to permit continuous operation of the landfill.” Mr. Iverson, the landfill supervisor, testified that BFI owed the duty to provide a safe environment for its employees and customers. Mike Strong, the City’s former superintendent of Solid Waste, testified that BFI was required to provide “adequate” personnel to perform all job functions. While Sullivan, Iverson and other witnesses said a designated spotter was required or normally present at the landfill, Mr. Strong correctly stated that such is not mandated by contract. Cf. Williams v. Gal-liano, 96 0690 (La.App. 1 Cir. 6/20/97), 697 So.2d 294, in which a “spotter, or traffic control attendant” was specifically required by contract. Mr. Strong further testified that the spotter could be a simple laborer, provided he could lead drivers to a safe dumping spot. In short, we perceive no manifest error in the District Court’s refusal to fault BFI for not providing a “designated” spotter. Nevertheless it is apparent that whoever spotted the driver was obliged to prepare or provide a reasonably safe, sturdy location, without the unreasonable risk of failing under the weight of a truck.
BFI correctly argues that Sullivan admitted he was in the best position to know whether he was able to make the dump safely, owing to his full knowledge of his own truck. He also admitted that he inspected the area to some degree before beginning to dump. BFI contends that Sullivan had the final responsibility for emptying his load safely. Sullivan testified that the site was unlevel, wet, soft and rutted, and yet he did not ask to be moved. By contrast, BFI argues that |9Branch properly spread and compacted the area, leveled it, and placed Sullivan in a location that was sufficient to make the dump. BFI further argues that the mere fact the surface of the landfill is wet and slick does not make it unreasonably dangerous. See, Tugger v. Continental Cas. Ins. Co., 27,047 (La.App. 2 Cir. 6/21/95), 658 So.2d 769, writs denied 95-1829, 1868 (La.11/3/95), 661 So.2d 1380. BFI finally argues that there was record evidence to suggest that Sullivan improperly locked both his tractor and trailer brakes before beginning to dump. It suggests that this, not the condition of the sin-face, caused the accident.
On these facts we perceive no manifest error in the District Court’s conclusion that both Sullivan and Branch were at fault in causing the accident. Applying the Watson factors, we find that both men had some awareness of the danger. Branch testified he had to “cut the grade” by removing the soft material from the top of the cell to make it safe; he himself had flipped a rig like *174 Sullivan’s under similar circumstances. Sullivan was an experienced trucker with some experience of landfills; he testified the surface was wet, muddy, and probably unlevel. He knew that his trailer could tilt over if a' rear tire settled a mere three inches. In short, both were aware of the risks. The significance of Branch’s conduct was greater than Sullivan’s; he plainly had the duty to make the cell surface stable for Sullivan, other truckers, and his fellow landfill workers. The capacities of the two men also suggest a greater responsibility for Branch. A fair reading of the record is that truckers normally rely on the directions of the spotter; however, they do not totally relinquish the control of their rigs. Because Sullivan admittedly observed the wet and difficult conditions in the landfill as he entered his cell, the District Court was not plainly wrong to find he could and should have taken the unusual step of asking for another spot. Finally, the hour was late, the conditions rainy; both men were likely acting in some haste. Given these facts, we simply cannot state that the District Court was plainly wrong to assess equal fault | i0to Sullivan and Branch. Clement v. Frey, supra; Socorro v. City of New Orleans, supra.
The District Court’s allocation of fault is therefore affirmed.

Other arguments anent liability

By their fifth assignment the Sullivans contend that BFI should be held strictly liable for a defect in its premises. Conceding that their burden of proving negligence is greater than that of proving strict liability, they nevertheless submit that a finding of liability under both theories should tilt the balance in favor of assigning more fault to BFI.
The plaintiff’s burden of proof, under strict liability, La. C.C. art. 2317, is essentially the same as that under negligence, La. C.C. art. 2315. Under either theory, the plaintiff must prove the existence of an unreasonably dangerous condition which caused his damages; in a negligence claim, the plaintiff must also prove the defendant was aware of the defect, but in a strict liability claim this is not required. Oster v. Department of Transp. & Dev., 582 So.2d 1285 (La.1991); Rich v. Tench Elec. Motor Works, Inc., 26,072 (La.App. 2 Cir. 8/19/94), 642 So.2d 293. In the instant case the District Court implicitly found that the cell surface was unreasonably dangerous, and specifically found that Branch caused that condition. The court obviously took into account, in allocating fault, the effect of Branch’s negligence and the magnitude of the risk he created. The fact that the plaintiffs may have also proved strict liability does not make the allocation plainly wrong. This assignment lacks merit. ■
By its second assignment BFI urges the District Court erred in admitting, over objection, an errata sheet to Sullivan’s deposition. BFI took Sullivan’s deposition in 1994; a transcript was forwarded to Sullivan’s attorney on December 9 of that year. The court reporter transcribed Sullivan as saying that when he began his dump, his tractor brakes were “already locked.” More than 30 days | ^elapsed; on February 7,1995, Sullivan returned the signed deposition with the correction, “unlocked (rather than ‘locked’).” At trial BFI argued the errata ■ sheet was inadmissible because Sullivan had not signed and returned it within 30 days, as required by La. C.C.P. art. 1445. BFI contended that if Sullivan locked his tractor brakes prior to the dump, this was an error which would cause the trailer to fall over regardless of the condition of the surface.
As noted, article 1445 permits a deponent to make “any changes in form or substance.” The admission of a deposition not signed by either the deponent or by the court reporter may be harmless error. McCoy v. Winn-Dixie of La. Inc., supra. In general, when the deponent makes a substantive correction to the deposition, both the changed and original versions are admissible. Lugtig v. Thomas, 89 F.R.D. 639 (N.D.I11. 1981).[5] This permits opposing counsel to *175 impeach the witness regarding his changed testimony. Id., and citations therein.
Contrary to what appears in the deposition, Sullivan testified emphatically on cross examination that the tractor brakes were actually unlocked. He explained that he corrected the deposition in February 1995. Given the permissive nature of art. 1445, and BFI’s failure to present authority to the contrary, we are not prepared to say the District Court lacked discretion to admit Sullivan’s belated errata sheet. Moreover, Sullivan was fully cross examined on the point, testifying that the brakes were unlocked, just as he wrote in the errata sheet; under the circumstances, the admission of the errata sheet, if error, would be harmless error. McCoy v. Winn-Dixie, supra. This assignment lacks merit.

Quantum

By their sixth assignment the Sullivans contend the District Court erred in awarding inadequate damages. They urge that the awards for pain and suffering, | i2future medicals and loss of future earnings are abusively low: instead of the $336,923 actually awarded, they “suggest” the award “should be” $1.2 million. They also submit that Mrs. Sullivan’s loss of consortium should be raised from $30,000 to $100,000.
By its third assignment, BFI urges the damages are excessive. It notes Sullivan’s failure to report any injury at the scene and the substantial delay before he sought medical attention as casting doubt on the credibility of his complaints. It also argues that Sullivan had significant pre-existing back problems, notably his prior disability rating and 1984 claim of permanent, total disability; the instant accident only aggravated this condition. It contests any award for the left knee injury: Sullivan did not report this to Dr. Gutnisky until four months after the accident, and in deposition the neurosurgeon stated he could not relate it to the accident “with a medical certainty.” BFI also contests any award for impotence, citing Sullivan’s failure to report this condition until over three years after the accident, and Dr. Swartz’s admission that he could only “guess” the physiological cause of it. BFI submits that the highest affirmable award for Sullivan’s general damages is $100,000, and for Mrs. Sullivan’s loss of consortium, $9,000.
General damage awards are subject to the “much discretion” of the District Court. We will not adjust a judgment to what it “should be”; if an abuse of discretion is found, we will raise it to the lowest, or lower it to the highest, amount within the court’s discretion. Reck v. Stevens, supra. The Sullivans’ argument is minimal, not directly addressing the medicals or future earnings, and only indicating that other cases gave higher awards for back patients who suffered impotency. See, e.g., Labit v. Setiff, 489 So.2d 942 (La.App. 5 Cir.1986), Guilbeaux v. Lafayette Gen’l Hosp., 589 So.2d 629 (La.App. 3 Cir.1991), Crane v. Exxon Corp. USA 613 So.2d 214 (La.App. 1 Cir.1992). These cases are not truly apposite; the plaintiff in Labit appears to have been in perfect health before hghis accident, and those in Guilbeaux and Crane sustained much more serious injuries than Sullivan. Without belaboring this long record, we will state that we find much evidence both to support and refute Sullivan’s descriptions of his pre- and post-injury conditions.
BFI’s argument is more specific. It contests causation by citing Sullivan’s failure to lodge a prompt complaint about his injury or seek immediate medical attention. These facts, however, are not fatal to the claim. See, Bruno v. Harbert Int’l Inc., 593 So.2d 357 (La.1992). Although Sullivan did not report back pain on the date of the accident, and sought medical attention only three weeks afterward, he consistently related his current back problems to the accident, and his wife corroborated him. Dr. Billings also related the current back problems to the accident. Sullivan’s complaints about his knee injury and impotence are slightly more problematic; he first reported these considerably later, and Drs. Gutnisky and Swartz frankly were not positive that the accident had caused these injuries. However, proof to a medical certainty is not required, only proof by a preponderance of the evidence. *176 Lasha v. Olin Corp., 625 So.2d 1002 (La. 1993). Dr. Swartz felt it was more probable than not that the accident' caused the impotence, which “not uncommonly” is associated with L4-5 spinal injury. Dep., 12, 25. As for the knee injury, Dr. Gutnisky could not relate it to the accident, but Dr. Billings testified that in addition to degenerative changes, the condition of Sullivan’s knee was “consistent with post traumatic exacerbation.” Dep., 25. Given the plaintiffs’ consistent testimony, and the medical evidence, we do not find the District Court was plainly wrong to find that these elements of damage resulted from the accident.
In sum, we do not find that items of damage contested by these assignments are either abusively high or low., Mr. Sullivan’s award will be affirmed.
Finally, both sides contest the quantum of Mrs. Sullivan’s loss of 1 uconsortium. We have already found the District Court was not plainly wrong to identify Mr. Sullivan’s impotence as a result of the accident; therefore we do not consider BFI’s argument that without causation the award must fall. Mrs. Sullivan testified, with sincerity that is apparent even on the impassive record, that prior to the accident they had a “normal” sex life, but since they have had none at all. She also testified that his back condition makes him jittery and easily upset, and prevents him from playing music, dancing and other activities they used to share. Sullivan admitted that because of nagging pain he is often “irritable” with his wife, spends much of his time in bed, and has been impotent.. While the award of $30,000 is at the upper end of reported cases, it is within the District Court’s discretion. Sistler v. Liberty Mutual, swpra; Lasha v. Olin Corp., supra; Mar-anto v. Goodyear Tire & Rubber Co., 25,114 (La.App. 2 Cir. 5/10/95), 661 So.2d 503. The consortium award will be affirmed.

Decree

For the reasons expressed, the judgment is affirmed in its entirety. Costs of appeal are assessed 25% to Mullen and Mary Sullivan, 25% to Fireman’s Fund Insurance Company, and 50% to Browning Ferris Industries.
AFFIRMED.
HIGHTOWER, J., concurs only.

. Iverson stated that he took these pictures (Exhibits COS-3 through 7) shortly after the accident, around 6:00 p.m. Sullivan contended, and landfill manager Vernon Hemphill agreed, that they must have actually been taken the next morning, because there is too much light in the pictures. The photos seem to be more consistent with morning light, yet the witnesses generally agreed they depicted the ground fairly well.

. As a result of the 1979 accident Sullivan missed approximately four years of work, and ultimately filed a suit for permanent, total workers comp benefits.

. The District' Court found no liability on the City's part, and this aspect of the judgment has not been contested.

. The Sullivans’ first and second assignments challenge the District Court’s mid-trial comment that the absence of a "trained spotter” was neither a breach of BFI’s duty nor a cause-in-fact of the accident. Appeal lies from the judgment itself, not the reasons for judgment. Hardin v. Munchies Food Store, 510 So.2d 33 (La.App. 2 Cir.1987), and citations therein. The substance of these assignments is therefore included in the discussion of BFI's fault.

. F.R.C.P. 30(e), prior to its 1993 amendment, is substantially similar to art. 1445. One court, however, has refused to permit wholesale amendments that totally alter the substance of the deposition. Greenway v. International Paper *175 Co., 144 F.R.D. 322, 24 Fed. R. Serv.3d 1396 (W.D.La.1992).