PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-1182
_____

EBC, INC.; STATE STEEL SUPPLY, INC.

v.

CLARK BUILDING SYSTEMS, INC.; AMERICAN
COMPOST CORPORATION;
A&M COMPOSTING, INC.; SOLID WASTE SERVICES,
INC.

State Steel Supply, Inc., Appellant
_____

On Appeal From the United States District Court
for the Western District of Pennsylvania
(Civil No. 2:05-cv-1549)
District Judge:  Honorable Nora B. Fischer

Submitted Under Third Circuit LAR 34.1(a)
February 23, 2010
_____

Before: SCIRICA and CHAGARES, Circuit Judges,
and RODRIGUEZ[*], District Judge

(Filed:  August 18, 2010)

Jennifer L. Gardner, Esq.
Margaret M. Metzinger, Esq.

_____

[*]The Honorable Joseph H. Rodriguez, Senior Judge of the
United States District Court for the District of New Jersey, sitting
by designation.

Stewart D. Roll, Esq.
Climaco Law Firm
55 Public Sq., Ste. 1950
Cleveland, OH 44113

Paul R. Rosenberger, Esq.
Persky, Shapiro & Arnoff
25101 Chagrin Blvd., Ste. 350
Beachwood, OH 44122

Counsel for Appellant

Albert A. DeGennaro, Esq.
2650 Audobon Rd.
Audobon, PA 19403

William F. Fox, Jr., Esq.
J.P. Mascaro & Sons
320 Godshall Dr.
Harleysville, PA 19438

Counsel for Appellees

_____

OPINION

_____

CHAGARES, Circuit Judge.

In April 2004, now-defunct Clark Building Systems, Inc. ("Clark") entered into a contract with appellee A&M Composting, Inc. ("A&M"), under which Clark would fabricate and deliver components for a large steel building to be assembled at A&M's facility. Clark, in turn, subcontracted with appellant State Steel Supply, Inc. ("State Steel") to supply raw steel for the project. When State Steel was not paid for a significant portion of the steel that it supplied, it brought this diversity action against A&M in the United States District Court for the Western District of Pennsylvania. The District Court granted A&M's motion for

summary judgment in part, rejecting State Steel's claims for breach of contract and an account stated. It denied summary judgment on State Steel's claims of unjust enrichment and fraudulent inducement, and a bench trial ensued. The District Court thereafter granted A&M's motion for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, and entered final judgment. State Steel now appeals. We will affirm.

I.

A.

A&M operates a composting facility in Lancaster, Pennsylvania.[1] In February 2003, a severe snowstorm caused the roof of its building to collapse, requiring replacement of the entire structure. On April 14, 2004, A&M engaged Clark in a contract (the "Contract") to fabricate a 465,000-square-foot facility composed of three steel buildings (collectively, the "Project Buildings") to replace the original. Joint Appendix ("JA") 320-21. A&M agreed to pay Clark a fixed price of $2,418,476, to be paid according to the following schedule:

Initial Down Payment Upon
Execution of the Agreement: $90,000

Second Down Payment Seven
Days After Execution of the Agreement: $507,619

Phased Payments Upon Delivery
of Fabricated Buildings According
to Phased Delivery Schedule: $1,820,857

JA 322-23. The Contract did not itemize expenses for project

_____

[1] Defendants American Compost Corporation, Solid Waste Services, Inc., and A&M Composting, Inc. are affiliated entities doing business as J.P. Mascaro & Sons. We refer only to A&M herein, although portions of the record that we cite refer to "Mascaro."

components, but the second payment was to be deposited into a joint checking account and was specifically "to be used to pay suppliers of the raw materials necessary for Clark to fabricate the Project Buildings." JA 323. Upon delivery of each segment of the Project Buildings, Clark was to invoice A&M, and A&M was to satisfy the invoice within seven days. JA 41, 323-24.

The Contract, under which time was of the essence, required Clark to fabricate the steel materials at its own facility and deliver them to A&M for assembly. Selected third parties would be responsible for the following: erecting the buildings, galvanizing the component steel materials, and supplying the necessary anchor bolts. JA 40, 322. Clark also represented that it "ha[d] the ability to secure and ha[d] made the necessary arrangements to secure the raw materials required for the fabrication of the Project Buildings . . . ." JA 325. To that end, Clark entered into subcontracts with, among others, State Steel and EBC, Inc. ("EBC") to provide the raw materials. Pursuant to these agreements, EBC was to supply purlins, roofing, and siding materials, and State Steel was to deliver shipments of raw steel to Clark's facility. JA 273, 278, 308-09. A&M was not a party to these subcontracts.

A&M paid Clark the initial down payment ($90,000) and thereafter deposited the second down payment ($507,619) into the joint checking account established for Clark's suppliers. EBC was paid from this account a deposit of $110,000 on April 23, 2004. JA 392-93. State Steel was also paid from this account a deposit of $100,000 on May 7, 2004. JA 337-38, 565-66.

On May 26, 2004, A&M's General Counsel, William Fox, sent a letter to State Steel's President, Adrienne Chizek,[2] which read in relevant part:

**Re: Your Contract with Clark Building Systems, Inc. For Web Materials for Further Processing by Clark**

---

[2] Chizek's surname is now Berg. For continuity, we refer only to the surname Chizek.

4

I am General Counsel for Solid Waste Services, Inc. d/b/a J.P. Mascaro & Sons and its affiliated companies ("Mascaro")[,] one of which is A&M Composting, Inc., the owner of the A&M Composting facility in Lancaster County, Pennsylvania.

Mascaro is a large regional company headquartered in Montgomery County, Pennsylvania, that engages in the collection, recycling, processing, transportation, disposal[,] and composting of solid waste. Mascaro has been in business for 35 years, it competes successfully with the national waste companies, it has strong, long-term bonding and banking relationships[,] and it is rated 5-A-1 by Dunn & Bradstreet.

Mascaro has contracted with Clark Building Systems, Inc. to provide a large fabricated steel building (i.e. approximately 465,000 square feet) related to the reconstruction of the A&M Compost facility. Clark has previous experience in providing this type of building to Mascaro, the last of which was a 250,000 square foot fabricated building for use at Mascaro's Wetzel County Compost facility in 2002.

We understand that Clark has contracted with your company to provide web materials for the A&M reconstruction project. We also understand that the amount of their contract with your company is approximately $450,000 and that Clark has made a substantial down payment to your company.

I am writing to advise you that under our contract with Clark, we make payment to Clark within seven days of the building material delivery for each completed phase, without defect, to our site. With respect to any balance that Clark may owe your

company for the web materials, [our] company is willing, with Clark's permission, to pay you directly or by joint check made payable to Clark and your company within the seven day period, as long as our payment is credited by Clark against the amount due under our contract with Clark. It is our understanding that Clark is agreeable to this arrangement.

I am providing a copy of this letter to Sol Wansor and Jeff Smith, the President and Controller of Clark, and if you have any questions, please feel free to contact either of them or me.

JA 308-09. Fox sent identical letters to EBC and another subcontractor with whom Clark had entered into a supply agreement. JA 309A-D. The letter (the "Fox Letter") underpins this dispute.

From May through November of 2004, State Steel delivered to Clark's facility a series of steel shipments, and it invoiced Clark accordingly. JA 42-43, 267. On August 4, 2004, Clark sent a request to A&M to forward a payment of $90,000 directly to State Steel for materials for which Clark had not yet paid. JA 568-70. A&M did so the following day. JA 49, 567. On September 24, 2004, Clark again requested that A&M forward $90,000 to State Steel for steel that had yet to be paid for, and A&M forwarded the payment to State Steel on September 27, 2004. JA 49-50, 571-72. These direct payments did not come from the joint checking account, and A&M made them with the understanding that its balance to Clark would be deducted accordingly. JA 49-50, 290. In all, A&M paid State Steel $280,000. JA 48.

Clark fell behind schedule in delivering the fabricated steel components to A&M. On September 2, 2004, Fox wrote to Clark's President, Sol Wansor, detailing Clark's "serious failure to adhere to the delivery and completion schedule" set forth by the Contract. Supplemental Appendix ("SA") 8. He explained that A&M was unable to operate without the new buildings, and that Clark's delay jeopardized a $200 million composting contract with a

6

governmental entity. Id. A&M ultimately hired mitigation subcontractors to complete the work for which Clark had been responsible under the Contract. JA 335-36; SA 11-15. This mitigation cost increased the total purchase price by $119,459.22, and was reflected in a Change Order form. JA 53, 336; SA 15. In a letter to Wansor dated October 7, 2004, Fox stated: "As a follow up to earlier correspondences, I have executed your form Change Order regarding the subcontractors that are now performing a portion of your work under the above-referenced contract. As indicated in my earlier letters, we have agreed to pay the subcontractors directly for the work they do." JA 335.

Delivery of the fabricated steel components was completed in January 2005, and the buildings were assembled by March 2005. JA 55. On July 11, 2005, Wansor wrote to Mascaro about outstanding balances that A&M purportedly owed to Clark's subcontractors. Wansor attached an earlier memorandum written by Jefferey Smith (Clark's Controller) indicating that A&M owed State Steel an additional $214,958.20 and EBC an additional $117,781.95. JA 347. A&M vigorously denied that it owed anything more to either of these subcontractors. JA 56-57. Though it had invoiced Clark for steel materials valued at $489,902.15, it is undisputed that State Steel received only three payments totaling $280,000. JA 55. EBC, too, never received full compensation for the materials that it had supplied. Clark ultimately went out of business and its assets were sold at a sheriff's sale. JA 7 n.2.

B.

State Steel and EBC filed this action against A&M and Clark[3] on November 7, 2005, asserting four claims against A&M:

_____

[3] Though Wansor and Smith testified at trial, Clark did not respond to the complaint or attempt to defend itself, and the District Court entered default judgment against it on December 16, 2008. JA 7 n.2, 29-30 & nn.3-4, 78. Additionally, EBC voluntarily dismissed its claims against the defendants before the District Court granted summary judgment, leaving State Steel as the only remaining plaintiff. JA 6 n.1, 29 n.2. Accordingly, we

7

(1) breach of contract; (2) fraudulent inducement; (3) unjust enrichment; and (4) an account stated. State Steel alleged that the Fox Letter constituted an enforceable agreement requiring A&M to pay directly the outstanding balance on the invoices for the steel supplied to Clark. Alternatively, it asserted that A&M, via the Fox Letter, fraudulently induced it to deliver the steel without any intent to provide full payment. Finally, State Steel claimed that A&M had been unjustly enriched by accepting the Project Buildings and that it had an unpaid and overdue account in the amount of $214,958.20.[4]

A&M moved for summary judgment on all counts, which the District Court granted in part and denied in part. With respect to the breach of contract claim, the District Court determined that it was "not unreasonable for a person in [State Steel's] position to view the letter . . . as an enforceable agreement." JA 14. However, the court concluded as a matter of undisputed material fact that State Steel had not regarded the Fox Letter as an offer to enter into a binding agreement. Relying on Chizek's deposition testimony, the District Court held that State Steel's outward and objective manifestations undermined any contractual agreement between A&M and State Steel. JA 15-16. The District Court also rejected State Steel's claim for an account stated because such a claim requires both parties to have agreed that a sum certain is owed, an element not satisfied under the undisputed facts. JA 22-23. But the District Court found genuine issues of material fact underlying the claims for fraudulent inducement and unjust enrichment, and it denied summary judgment on those two causes of action. JA 16-22.

State Steel moved the District Court to reconsider its disposition of the breach of contract claim. It relied upon an errata sheet to Chizek's deposition testimony that had been included as an exhibit to its original papers opposing A&M's motion for summary

---

review only State Steel's claims against A&M.

[4] Evidently $5,056.05 of this sum had actually been paid. Accordingly, State Steel seeks payment for $209,902.15. See State Steel Br. at 41 & n.5.

8

judgment. The errata sheet purported to clarify the answers upon which the District Court had relied in rejecting the claim. JA 282. Finding it untimely and otherwise noncompliant with Rule 30(e), the District Court refused to consider the errata sheet and denied the motion for reconsideration. EBC, Inc. v. Clark Bldg. Sys., No. 05-1549, 2008 U.S. Dist. LEXIS 3728, at *2-6 (W.D. Pa. Jan. 16, 2008). State Steel filed a second motion for reconsideration, which the District Court denied in a summary order.[5]

The District Court held a two-day bench trial on the remaining claims, during which State Steel presented the testimony of four witnesses: Wansor, Smith, Fox (as an adverse witness), and Chizek. JA 33-34. During its case-in-chief, State Steel stipulated to A&M's offer of two key exhibits into evidence: (1) Joint Exhibit 25, a spreadsheet summarizing A&M's total disbursements to Clark and its subcontractors; and (2) Defendants' Exhibit 1, a voluminous set of business records submitted to substantiate Joint Exhibit 25. JA 64, 246. After State Steel rested its case, A&M moved for judgment on partial findings pursuant to Rule 52(c), and State Steel again moved for reconsideration of the breach of contract claim. On November 13, 2008, the District Court issued a comprehensive memorandum opinion: (1) denying State Steel's motion for reconsideration for the reasons it had previously stated; and (2) granting A&M's Rule 52(c) motion in toto. Rejecting the unjust enrichment claim, the court found that A&M had paid more than the adjusted Contract price, and therefore held that it would be inequitable to force A&M to pay, in effect, for the same raw materials again. JA 60-68. The court also rejected the fraudulent inducement claim, concluding that State Steel had not proven any material misrepresentations. JA 68-74. State Steel timely

_____

[5] Shortly before trial, State Steel filed alternative motions pursuant to Rule 54(b) and 28 U.S.C. § 1292(b), requesting that the District Court either direct the entry of final judgment on the breach of contract claim or certify an interlocutory appeal. JA 33. It also requested permission to question Chizek at trial regarding the breach of contract claim. Id. The District Court denied these requests as well. EBC, Inc. v. Clark Bldg. Sys., No. 05-1549, 2008 U.S. Dist. LEXIS 21018 (W.D. Pa. Mar. 17, 2008).

appealed.[6]

## II.

State Steel argues first that the District Court erred by granting A&M's motion for summary judgment on the breach of contract claim.[7] It asserts that by offering to tender direct payments to it (instead of Clark) upon delivery of the steel, A&M incurred an unqualified legal obligation to make such payments. A&M, conversely, argues that the letter was a mere accommodation to pay the subcontractor in a more convenient manner, but in no way constituted a binding legal obligation to make direct payments.

We review the District Court's grant of summary judgment de novo, using the same standard that it was required to apply. Brown v. J. Kaz, Inc., 581 F.3d 175, 179 (3d Cir. 2009). A court reviewing a summary judgment motion must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 330 (3d Cir. 1995). Summary judgment is appropriate "only when the record 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Clark v. Modern Group Ltd., 9 F.3d 321, 326 (3d Cir. 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter . . . ." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (citing Anderson, 477 U.S. at 247-48).

---

[6] The District Court had jurisdiction under 28 U.S.C. § 1332(a), and we have jurisdiction under 28 U.S.C. § 1291.

[7] State Steel does not challenge the District Court's rejection of the claim for an account stated and we do not discuss it further.

It is undisputed that Pennsylvania law applies. The District Court focused its analysis on State Steel's outward manifestations with respect to the Fox Letter, and so shall we. The relevant test under Pennsylvania law "for [the] enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986) (citing Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956); Linnet v. Hitchcock, 471 A.2d 537, 540 (Pa. Super. Ct. 1984)). It is well established in Pennsylvania that "[i]n ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." Espenshade v. Espenshade, 729 A.2d 1239, 1243 (Pa. Super. Ct. 1999) (citation omitted). State Steel argues that it "understood the [Fox Letter] to be a promise[] by [A&M] to pay State Steel for steel which it delivered," and that because A&M had a contrary understanding, a genuine issue of material fact regarding the parties' intent remains. State Steel Br. at 24.[8]

It is true that "when the record contains conflicting evidence regarding intent, the question of whether the parties formed a completed contract is one for the trier of fact." Channel Home Ctrs., 795 F.2d at 300 n.9 (citing Field v. Golden Triangle Broad., Inc., 305 A.2d 689, 691 (Pa. 1973); Yellow Run Coal Co. v.

---

[8] Throughout its appellate brief, State Steel cites testimony later adduced at trial to support its challenge to the District Court's grant of summary judgment. That evidence, of course, was not before the District Court at the time it addressed the summary judgment motion, and we may not consider it when reviewing the court's decision. See Hildebrandt v. Ill. Dep't of Natural Res., 347 F.3d 1014, 1040 (7th Cir. 2003) ("In evaluating the propriety of summary judgment on appeal, we are limited to reviewing what the district court had before it at the time it granted summary judgment; such evidence does not include trial testimony." (citing Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 242 (4th Cir. 2002))).

Alma-Elly-Yv Mines, Ltd., 426 A.2d 1152, 1154 (Pa. Super. Ct. 1981)). The District Court specifically recognized as much, JA 14, but concluded – based on Chizek's deposition testimony – that there was no evidence supporting State Steel's supposed belief that the Fox Letter constituted a legally binding agreement. That deposition testimony, in pertinent part, reads as follows:

Q.      Do you know why [the Fox Letter] was sent?

A.      Honestly I don't.

Q.      [D]id you indicate or have any conversations with Clark about your concern about them paying invoices?

A.      I don't remember that part.  We knew that it had to be up front, so I don't remember what – why it came to this, that [A&M] sent it.

. . .

Q.      What was your understanding of that letter?

A.      That Mascaro – between Mascaro and Clark, we would be taken care of and they were doing the building for a good company.

Q.      Did you ever think that as a result of that letter, that you would be billing any of the Mascaro entities?

A.      No.

Q.      Did you ever think from that letter that any of the Mascaro entities were . . . guaranteeing payment of your invoices?

A.      I don't know that I really thought about it, it's just it was going to come from Clark and they had a sound contract with Mascaro and

12

everything would be okay.

. . .

Q.  [B]ased upon getting that letter, what was your understanding of how your invoices would be paid if and when A&M . . . had paid the 2.4 million and you still had invoices outstanding?

A.  I never thought about it.

Q.  Would you think if [A&M] had a contract with Clark to pay them 2.4 million for the whole nine yards, which included your materials, and that they paid Clark the 2.4 million, that they would be paying you additional monies for the materials[?]

A.  No, I don't think I would have expected that.

JA 274-75.

We agree with the District Court that "[i]f State Steel believed that no contract existed as a result of the [Fox Letter] and its manifested intent to . . . A&M did not demonstrate a belief to the contrary, then no contract . . . exist[ed]." JA 15-16. We further agree that Chizek's testimony removes any genuine issue of material fact concerning the Fox Letter's legal import. Chizek twice admitted at her deposition that she did not know why Fox wrote the letter, and also conceded that she had never considered whether the letter was a guarantee. Critically, she admitted that she would not have expected A&M to be responsible for paying State Steel if A&M made payments equaling the final Contract price. Chizek's admissions regarding her beliefs – and her company's failure to conduct itself in a manner inconsistent with those beliefs – evidence beyond repudiation that State Steel did not objectively regard the Fox Letter to constitute a binding contract.

State Steel does not seriously dispute that Chizek's original

13

deposition testimony undermines the existence of a binding agreement, but argues that the District Court improperly refused to consider the errata sheet that Chizek executed four months after her deposition. The errata sheet, the substance of which we reproduce below, altered the deposition testimony upon which the District Court relied in granting summary judgment. We will assume, arguendo, that the propriety of summary judgment on the breach of contract claim rests on the propriety of refusing to consider Chizek's submitted errata.

The District Court's interpretation of the Federal Rules of Civil Procedure is a legal issue that we review de novo, but assuming it has correctly interpreted the rules, its ultimate decision to ignore the errata sheet is reviewed for abuse of discretion. See United Auto. Workers Local 259 Soc. Sec. Dep't v. Metro Auto Ctr., 501 F.3d 283, 286 (3d Cir. 2007); Hambleton Bros. Lumber Co. v. Balkin Enters., Inc., 397 F.3d 1217, 1224 nn.4-5 (9th Cir. 2005). This Court has not spoken previously regarding: (1) the extent to which a party may establish a genuine issue of material fact by using a deposition errata sheet; and (2) whether and when a District Court may ignore a noncompliant errata sheet. Accordingly, we first take the opportunity to address the contours of the rule governing errata sheets. We then apply the standards we enunciate.

A.

Rule 30(e) of the Federal Rules of Civil Procedure provides as follows:

**(e) Review by the Witness; Changes**.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript

14

or recording[9] is available in which:

>(A) to review the transcript or recording; and
>
>(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.
>
>(2) Changes Indicated in the Office's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1)[10] whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

Fed. R. Civ. P. 30(e). The rule contemplates a number of procedural requirements to be satisfied by both the party/deponent and the "officer" – assumed herein to be the court reporter, see Fed. R. Civ. P. 28 – before changes to deposition testimony may be permitted. Upon satisfaction of these procedural hurdles, the rule then envisions "changes in form or substance." We address the procedural and substantive aspects of the rule in turn.[11]

---

[9] For purposes of this opinion, we will refer to the "transcript or recording" as the "deposition transcript."

[10] Rule 30(f)(1) governs the certification and delivery of the deposition transcript by the court reporter. Relevant here, the rule requires the court reporter to certify in writing that the deponent was duly sworn and that the transcript accurately depicts the deponent's testimony. Fed. R. Civ. P. 30(f)(1). Further, the court reporter's certification must accompany the deposition transcript, and the transcript must be delivered promptly to the attorney who arranged for the transcript's production. Id.

[11] Rule 30 was amended in 2007 as part of the general restyling of the Federal Rules of Civil Procedure. "These changes [we]re intended to be stylistic only." Fed. R. Civ. P. 30 advisory committee's note. Accordingly, the pre-amendment cases cited

1.

The procedural requirements of Rule 30(e) are clear and mandatory. As a threshold, Rule 30(e)(1) requires the party or deponent to request review of the deposition before the deposition itself is completed. See Hambleton Bros., 397 F.3d at 1226 ("[Rule] 30(e) . . . requires the deponent or the interested party to request review of the deposition in order to make corrections."); Rios v. Bigler, 67 F.3d 1543, 1551-52 (10th Cir. 1995) ("Under the plain language of Rule 30(e) . . . the deponent or party must request review of the deposition before its completion. . . . [This procedure is] an absolute prerequisite to amending or correcting a deposition under Rule 30(e)."); Agrizap, Inc. v. Woodstream Corp., 232 F.R.D. 491, 494 (E.D. Pa. 2006) (barring witness from changing deposition transcript for failure to request review before completion of the deposition). Rule 30(e)(2) also requires the court reporter to certify that review was in fact requested. Without such a certification, a court cannot determine whether the threshold requirement has been satisfied. See Rios, 67 F.3d at 1552; Blackthorne v. Posner, 883 F. Supp. 1443, 1454 n.16 (D. Or. 1995).

"If the party or deponent [has] properly request[ed] review, [he or she] may submit changes to [the] deposition within thirty days after being notified by the officer that the transcript is available for review." Rios, 67 F.3d at 1552; accord Agrizap, 232 F.R.D. at 492-94; Griswold v. Fresenius USA, Inc., 978 F. Supp. 718, 722 (N.D. Ohio 1997). We emphasize that Rule 30(e)'s thirty-day clock begins to run when the party is notified by the court reporter that transcript is available for review, not when the party or deponent physically receives the transcript from the court reporter. See Hambleton Bros., 397 F.3d at 1224 ("[Rule] 30(e) states that the thirty-day correction clock begins upon notification of availability, not possession."); Welsh v. R.W. Bradford Transp., 231 F.R.D. 297, 298-99 (N.D. Ill. 2005) ("At least part of Rule 30 could not be more straightforward: a deponent has 30 days after notification by the court reporter to review the deposition transcript

---

herein apply with equal force to the amended rule.

16

and to sign a statement setting forth any changes and the reasons for those changes." (emphasis in original)); Holland v. Cedar Creek Mining, Inc., 198 F.R.D. 651, 653 (S.D. W. Va. 2001) ("[T]he 30 day period begins on the date that the deponent receives notice of the availability of the transcript from the court reporter."). Courts are entitled to enforce Rule 30(e)'s time limit strictly and strike untimely errata. See Holland, 198 F.R.D. at 653 ("This court, like most courts, will insist on strict adherence to the technical requirements of Rule 30(e).").[12]

Rule 30(e)'s final procedural hurdle requires the party or deponent seeking to change a deposition transcript to include with the proposed changes a statement of reasons for making them. As the Court of Appeals for the Ninth Circuit has explained:

> A statement of reasons explaining corrections is an important component of errata submitted pursuant to [Rule] 30(e), because the statement permits an assessment concerning whether the alterations have a legitimate purpose. . . . The absence of any stated reasons for the changes supports the magistrate judge's concern that the "corrections" were not corrections at all, but rather purposeful rewrites tailored to manufacture an issue of material fact . . . and to avoid a summary judgment in [the defendant's] favor.

---

[12] Note, however, the phrasing of the rule – it provides that a party or deponent "must be allowed 30 days" to submit errata (the rule formerly stated that the party or deponent "shall have 30 days"). Fed. R. Civ. P. 30(e)(1). The natural language of the rule, then, does not preclude courts from allowing more time upon a prior request or forgiving minor untimeliness after the fact. Instead, the rule grants courts discretion to do so under appropriate circumstances. While courts retain the authority to enforce the amendment window strictly, we leave the matter to their sound discretion to determine if and when extension of the time limit is appropriate.

Hambleton Bros., 397 F.3d at 1224-25; see also Hawthorne Partners v. AT&T Techs., Inc., 831 F. Supp. 1398, 1406 (N.D. Ill. 1993) ("[Rule] 30(e) allows a witness to make . . . 'changes in form or substance' to a deposition transcript but requires a statement of reasons for making them.").

Courts have found that the failure to provide a statement of reasons alone suffices to strike a proposed change. See, e.g., Holland, 198 F.R.D. at 653 ("The witness is also plainly bound by the rule to state specific reasons for each change."); Duff v. Lobdell-Emery Mfg. Co., 926 F. Supp. 799, 804 (N.D. Ind. 1996) ("The rule is not onerous . . . but there must be a reason for every change." (quotation marks omitted)). We agree with these courts. If the party or deponent proffering changes in the form or substance of a deposition transcript fails to state the reasons for the changes, the reviewing court may appropriately strike the errata sheet.[13]

2.

Upon procedural compliance with Rule 30(e), the court will determine the effect of the errata sheet on the deposition transcript. The courts are divided on the extent to which a party or deponent may change substantively the deposition transcript after review. Some courts have determined that the rule places no limitation on changes. Therefore, according to these courts, substantive changes must be permitted, even if they contradict the original answers or the reasons for making the changes are unpersuasive.[14] To protect

---

[13] While a party need only provide some reason to clear Rule 30(e)'s procedural hurdle, courts – as discussed infra – may consider unsatisfactory or conclusory reasons when addressing whether contradictory errata should be permitted as a substantive matter.

[14] See, e.g., Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997); Reilly v. TXU Corp., 230 F.R.D. 486, 489-92 (N.D. Tex. 2005); Foutz v. Town of Vinton, 211 F.R.D. 293, 295 (W.D. Va. 2002); DeLoach v. Phillip Morris Cos., Inc., 206 F.R.D. 568, 572-73 (M.D.N.C. 2002);; Elwell v. Conair, Inc., 145

against abuse, these courts emphasize that the earlier testimony is not expunged from the record, thus subjecting the deponent to cross-examination and impeachment at trial with respect to the contradictory testimony. See, e.g., Reilly, 230 F.R.D. at 490-91; Foutz, 211 F.R.D. at 295, Elwell, 145 F. Supp. 2d at 87. Some courts also permit the deposing party to reopen the deposition (with costs to be borne by the amending party) to question the deponent on the alteration. See Reilly, 230 F.R.D. at 490.

Other courts have read Rule 30(e) more narrowly. These courts have determined that the rule permits changes of substance only to the extent that the proposed alteration is consistent with the deponent's testimony. The champion of this view is Greenway v. International Paper Co., in which the court explained:

> The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.

144 F.R.D. 322, 325 (W.D. La. 1992).[15]

---

F. Supp. 2d 79, 86-87 (D. Me. 2001); Holland, 198 F.R.D. at 653; Titanium Metals Corp. v. Elkem Mgmt., Inc., 191 F.R.D. 468, 472 (W.D. Pa. 1998); United States ex rel. Burch v. Piqua Eng'g, Inc., 152 F.R.D. 565, 566-67 (S.D. Ohio 1993); Sanford v. CBS, Inc., 594 F. Supp. 713, 714-15 (N.D. Ill. 1984); Lugtig v. Thomas, 89 F.R.D. 639, 641 (N.D. Ill. 1981); Allen & Co. v. Occidental Petroleum Corp., 49 F.R.D. 337, 340 (S.D.N.Y. 1970).

[15] See also Hambleton Bros., 397 F.3d at 1225; Garcia v. Pueblo Country Club, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002);

We are called upon to interpret Rule 30(e) in the summary judgment context. We believe that a flexible approach – consistent with our prior analogous jurisprudence – is appropriate. As a general proposition, a party may not generate from whole cloth a genuine issue of material fact (or eliminate the same) simply by re-tailoring sworn deposition testimony to his or her satisfaction. See Hambleton Bros., 397 F.3d at 1225 ("While the language of [Rule] 30(e) permits corrections 'in form or substance,' this permission does not properly include changes offered solely to create a material factual dispute in a tactical attempt to evade an unfavorable summary judgment." (citing Combs v. Rockwell Int'l Corp., 927 F.2d 486, 488-89 (9th Cir. 1991))); Garcia v. Pueblo Country Club, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002) (finding summary judgment inappropriate and rejecting defense counsel's attempt to eliminate genuine issues of material fact through changes in a deposition transcript, admonishing "[w]e do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony."); Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000) (affirming the grant of summary judgment, and concluding that "a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not'").

Where proposed changes squarely contradict earlier testimony materially bearing on the case, preserving the original testimony or reopening the deposition may often prove to be

Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000); Wyeth v. Lupin Ltd., 252 F.R.D. 295, 297 (D. Md. 2008); Adams v. Allied Sec. Holdings, 236 F.R.D. 651, 652 (C.D. Cal. 2006); Wigg v. Sioux Falls Sch. Dist. 49-5, 274 F. Supp. 2d 1084, 1090-91 (D.S.D. 2003); Summerhouse v. HCA Health Servs. of Kan., 216 F.R.D. 502, 504-08 (D. Kan. 2003); Coleman v. S. Pac. Transp. Co., 997 F. Supp. 1197, 1201 (D. Ariz. 1998); S.E.C. v. Parkersburg Wireless LLC, 156 F.R.D. 529, 535-36 (D.D.C. 1994); Rios v. Welch, 856 F. Supp. 1499, 1502 (D. Kan. 1994); Barlow v. Esselte Pendaflex Corp., 111 F.R.D. 404, 406 (M.D.N.C. 1986).

insufficient remedies.  Moreover, requiring trial judges in all cases to permit contradictory alterations could risk the defeat of summary judgment in a large swath of cases for which a Rule 56 disposition otherwise would be appropriate.  Preservation of the original testimony for impeachment at trial serves as cold comfort to the party that should have prevailed at summary judgment.  And reopening the deposition before disposition might not be a sufficient remedy, for the deponent who has reviewed his original testimony and settled on an opposite answer may prove unimpeachable.

We therefore hold that when reviewing a motion for summary judgment, a district court does not abuse its discretion under Rule 30(e) when it refuses to consider proposed substantive changes that materially contradict prior deposition testimony, if the party proffering the changes fails to provide sufficient justification.  At the same time, we emphasize that courts may, in their discretion, choose to allow contradictory changes (and implement the remedial measures discussed above) as the circumstances may warrant.

Our "sham affidavit" cases – which permit courts to ignore affidavits that contradict earlier deposition testimony without adequate explanation – provide useful guidance.  See Hambleton Bros., 397 F.3d at 1225 (applying sham affidavit cases in analyzing Rule 30(e) issue); Burns v. Bd. of County Comm'rs, 330 F.3d 1275, 1281-82 (10th Cir. 2003) (same); Thorn, 207 F.3d at 389 (same).  In Martin v. Merrell Dow Pharmaceuticals, Inc., we affirmed a district court's refusal to consider a "squarely contradict[ory]" affidavit filed after a summary judgment motion had been filed.  851 F.2d 703, 705-06 (3d Cir. 1988).  We explained:

> We recognize that there are situations in which sworn testimony can quite properly be corrected by a subsequent affidavit.  Where the witness was confused at the earlier deposition or for some other reason misspoke, the subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact.  The case before us, however, does not present such a situation. . . .

21

Plaintiff's affidavit, submitted only after she faced almost certain defeat in summary judgment, flatly contradicted no less than eight of her prior sworn statements[.] . . . [T]he objectives of summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit. . . . When, as in the present case, the affiant was carefully questioned on the issue, had access to the relevant information at that time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a genuine issue of material fact.

Id. (emphasis in original)[16]; see also Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004) ("[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." (citing Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991))); Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986); Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969). Also pertinent to our analysis in Martin was the importance of the questioning on which the plaintiff had altered her testimony and the questionable timing of the affidavit. 851 F.2d at 705. These considerations, of course, must be taken into account with all of the surrounding circumstances. See Baer, 392 F.3d at 624.

Recently, in Jiminez v. All American Rathskeller, Inc., we

_____

[16] While we emphasized the absence of any explanation for the change in testimony, we did not purport to allow in all cases the simple expedient of claiming confusion to legitimate a proposed change. Indeed, we stated that the affiant must provide a "satisfactory explanation for the later contradiction." Martin, 851 F.2d at 706 (emphasis added). Thus, courts are free to, and should, review the sufficiency of the stated reasons for submitting an errata sheet, as well as the surrounding circumstances, in determining whether contradictory changes should be permitted.

reaffirmed the sham affidavit doctrine's "continued vitality and importance":

> A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant. . . . [I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.

503 F.3d 247, 253 (3d Cir. 2007) (citations omitted). We explained that while some courts have prescribed a formulaic application to the sham affidavit doctrine, we "have adopted a more flexible approach." Id. at 254 (citing Baer, 392 F.3d at 624; Hackman, 932 F.2d at 241; Martin, 851 F.2d at 705-06). In other words, "not all contradictory affidavits are necessarily shams," and "'when there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit.'" Id. (quoting Baer, 392 F.3d at 625).[17]

---

[17] Moreover, we have gone so far as to reverse a district court, in part for refusing to consider an affidavit that did not in fact contradict the earlier deposition testimony. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 276 n.3, 284 (3d Cir. 2000); see also Baer, 392 F.3d at 624 ("[I]t is clear that merely because there is a discrepancy between deposition testimony and the deponent's later affidavit a district court is not required in all cases to disregard the affidavit."); Kennett-Murray Corp. v. Bone, 622 F.2d 887, 893 (5th Cir. 1980) ("[A] district court . . . cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition.").

We see no principled reason to distinguish between affidavits and errata sheets in this context, and we conclude that the proper analysis for each is the same. Requiring consideration of contradictory errata in all cases, no less so than contradictory affidavits, "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Perma Research, 410 F.2d at 578. But nothing in the foregoing requires courts to strike contradictory errata if sufficiently persuasive reasons are given, if the proposed amendments truly reflect the deponent's original testimony, or if other circumstances satisfy the court that amendment should be permitted. Each case will present fact-sensitive circumstances, and we are disinclined to prescribe a one-size-fits-all rule. Our discussion above, however, along with our existing sham-affidavit jurisprudence, should provide needed guidance for district courts to use hereafter.

B.

We now apply these standards to Chizek's handwritten errata sheet. It is undisputed that State Steel adequately requested review before the close of the deposition. In addition, the court reporter certified "that the inspection, reading[,] and signing of [the] deposition were NOT waived by counsel for the respective parties and by the witness." JA 281 (capitalization in original). Finally, we note that Chizek provided a reason, although perfunctory, for the errata: "After reading the transcript, I realized that I was confused and misunderstood some of the questions." JA 282.

Chizek and State Steel's compliance with Rule 30(e), however, terminates there. The District Court held that the errata sheet was untimely. We agree, and we therefore find no abuse of discretion in the court's refusal to consider it. Chizek was deposed on December 13, 2006. The court reporter certified the original transcript and provided notice of its availability to State Steel's counsel on January 15, 2007. JA 281, 283. Thus, the deadline to amend was February 14, 2007.

Chizek purportedly executed the errata sheet on March 12, 2007, twenty-six days after the deadline, and defense counsel never

24

received it for attachment to the original transcript.  JA 282; SA 2-3.  State Steel revealed the errata sheet for the first time as an exhibit to its opposition to A&M's motion for summary judgment, three months after the amendment window had closed.[18]

State Steel argues that it did not receive the original transcript until February 20 or 21, 2007 due to a payment issue with the transcription company.  State Steel Reply Br. at 5.  But as we have explained, the thirty-day time limit runs from the date the court reporter provides notice of the transcript's availability, not from the date when the transcript is physically received.  The District Court did not abuse its discretion in requiring strict adherence to the time limit, payment issues notwithstanding.  See Del. Valley Floral Group, Inc. v. Shaw Rose Nets, LLC, 597 F.3d 1374, 1380-81 (Fed. Cir. 2010) ("[The appellant] did not attempt to submit an errata sheet to make substantive changes to his unequivocal testimony until after the thirty days permitted under Rule 30(e) . . . .  Under the circumstances here, [he] has failed to demonstrate that the district court abused its discretion by excluding his errata sheet.").

Even if State Steel had complied with the procedural requirements of Rule 30(e), we would still find no error in the

---

[18] The District Court also rejected the errata sheet because it was not properly filed with the court, provided to the court reporter, or disclosed to A&M's counsel.  See EBC, Inc. v. Clark Bldg. Sys., No. 05-1549, Dkt. Entry # 81 (W.D. Pa. Feb. 5, 2008).  State Steel argues, however, that Chizek did indeed return the errata sheet to the court reporter, but that the court reporter never attached it to the original transcript.  State Steel filed an affidavit of counsel attesting to that fact in its second motion for reconsideration.  A&M, in response, filed an affidavit of the court reporter attesting that neither she nor her company ever received the errata sheet.  We are left to wonder why State Steel waited to submit counsel's affidavit until its second reconsideration motion.  In any event, even according to counsel's own affidavit, Chizek forwarded the errata sheet to the court reporter after the thirty-day amendment window had closed, making it untimely still.

District Court's refusal to consider the errata sheet. When asked in her deposition whether she knew why the Fox Letter had been sent, Chizek answered, "Honestly I don't." JA 274. The errata sheet stated quite the opposite: "Yes – because State Steel Supply, Inc. was not comfortable with extending that much credit to Clark Bldg. That is why we required the $100,000 check up front. We discussed that with Clark from the beginning." JA 282. When asked whether she thought the Fox Letter was guaranteeing payment of State Steel's invoices, Chizek answered, "I don't know that I really thought about it . . . ." JA 274. The errata sheet, however, tells a different story: "Yes – I would take the letter to be a guarantee of payment." JA 282.[19]

These contradictory amendments cannot establish a genuine issue of material fact where the original testimony did not. Chizek's answers were central to the contractual analysis, and were in response to careful and repeated questioning. We also find no record support for Chizek's conclusory explanation that she realized, upon review, that she had been confused by the questions. The only corroborative evidence to which State Steel points is Chizek's later trial testimony, which was consistent with her amended answers. We do not consider this evidence, see supra note 8, but find it unsurprising that after review of her damaging deposition testimony, Chizek settled on consistent and, incidentally, helpful answers. Given all of the circumstances under which the errata sheet was revealed, the District Court could have excluded the contradictory errata as a substantive matter.

\*     \*     \*

We conclude that the District Court did not abuse its discretion in refusing to consider Chizek's untimely and contradictory errata sheet. On the evidence before it, therefore, the District Court correctly granted summary judgment on the breach of contract claim and denied State Steel's motions for

---

[19]Chizek's other two amended answers are fairly consistent with her original testimony, but do refer to a "guarantee" that did not appear in her original testimony.

reconsideration.

## III.

We turn to the claims for unjust enrichment and fraudulent inducement, the subjects of the bench trial. State Steel argues that the District Court erred by granting A&M's motion for judgment on partial findings pursuant to Rule 52(c). That rule provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c). The rule's objective is to "conserve[] time and resources by making it unnecessary for the court to hear evidence on additional facts when the result would not be different even if those additional facts were established." 9 James Wm. Moore et al., Moore's Federal Practice, § 52.50[2] (3d ed. 2010).[20]

A court may grant a Rule 52(c) motion made by either party or may grant judgment sua sponte at any time during a bench trial,

_____

[20] Subdivision (c) was added to Rule 52 in 1991. It replaced a portion of Rule 41(b), which previously permitted a court to enter judgment against a plaintiff at the close of his or her case-in-chief if he or she failed to meet the applicable burden of proof. See Fed. R. Civ. P. 52(c) advisory committee's note. Thus, Rule 52(c) operates more broadly than did its predecessor, because courts may now make partial findings on any claim or defense, of any party, at any time. Nonetheless, pre-1991 cases interpreting Rule 41(b) continue to provide guidance. See Fechter v. Conn. Gen. Life Ins. Co., 800 F. Supp. 182, 196 (E.D. Pa. 1992).

so long as the party against whom judgment is to be rendered has been "fully heard" with respect to an issue essential to that party's case. As a result, the court need not wait until that party rests its case-in-chief to enter judgment pursuant to Rule 52(c). See N.Y. Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238, 246 n.6 (3d Cir. 2007) ("[T]he Federal Rules of Civil Procedure . . . allow judgment after partial findings against a party that has been fully heard on the relevant issue."); Feliciano v. Rullan, 378 F.3d 42, 59 (1st Cir. 2004) ("When a party has finished presenting evidence [as to a particular issue] and that evidence is deemed by the trier insufficient to sustain the party's position, the court need not waste time, but, rather, may call a halt to the proceedings and enter judgment accordingly."); Granite States Ins. Co. v. Smart Modular Techs., Inc., 76 F.3d 1023, 1031 (9th Cir. 1996) ("[T]he rule 'authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence.'" (quoting Fed. R. Civ. P. 52(c) advisory committee's note)).[21] Of course, the court may opt to reserve judgment until all the evidence is in or until the close of the non-movant's case-in-chief. See Int'l Union of Operating Eng'rs, Local Union 103 v. Ind. Constr. Corp., 13 F.3d 253, 257 (7th Cir. 1994) ("[I]t is within the trial court's sound discretion to decline rendering judgment until hearing all of the evidence.").

In considering whether to grant judgment under Rule 52(c), the district court applies the same standard of proof and weighs the evidence as it would at the conclusion of the trial. See Emerson Elec. Co. v. Farmer, 427 F.2d 1082, 1086 (5th Cir. 1970); Falter v. Veterans Admin., 632 F. Supp. 196, 200 (D.N.J. 1986).

---

[21] The requirement that a party must first be "fully heard" does not, however, "amount to a right to introduce every shred of evidence that a party wishes, without regard to the probative value of that evidence." First Va. Banks, Inc. v. BP Exploration & Oil, Inc., 206 F.3d 404, 407 (4th Cir. 2000). In this respect, it is within the discretion of the trial court to enter a judgment on partial findings even though a party has represented that it can adduce further evidence, if under the circumstances, the court determines that the evidence will have little or no probative value. See id.

Accordingly, the court does not view the evidence through a particular lens or draw inferences favorable to either party. See Ritchie v. United States, 451 F.3d 1019, 1023 (9th Cir. 2006); Giant Eagle, Inc. v. Fed. Ins. Co., 884 F. Supp. 979, 982 (W.D. Pa. 1995). The district court should also make determinations of witness credibility where appropriate.[22] See Parker v. Long Beach Mortgage Co., 534 F. Supp. 2d 528, 535 (E.D. Pa. 2008); Falter, 632 F. Supp. at 200. Finally, if the court enters judgment under Rule 52(c), it must make findings of fact and conclusions of law pursuant to Rule 52(a).

We review the district court's factual findings for clear error and its legal conclusions de novo. See Rego, 181 F.3d at 400. For a finding to be clearly erroneous, we must be left with the definite and firm conviction that a mistake has been committed. Gordon v. Lewistown Hosp., 423 F.3d 184, 201 (3d Cir. 2005). We will not reverse "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety" even if we would have weighed that evidence differently. Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985). "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Id. at 575; accord MacDraw, Inc. v. CIT Group Equip. Fin., Inc., 157 F.3d 956, 962 (2d Cir. 1998).

## A.

State Steel argues that A&M was unjustly enriched by accepting assembly of the Project Buildings (containing the raw steel) without providing full compensation. To prevail on an unjust

---

[22] In these respects, judgments on partial findings differ qualitatively from judgments as a matter of law under Rule 50(a). See Rego v. ARC Water Treatment Co. of Pa., 181 F.3d 396, 400 (3d Cir. 1999); Fed. R. Civ. P. 52(c) advisory committee's note ("The standards that govern judgment as a matter of law in a jury case have no bearing on a decision under Rule 52(c).").

enrichment claim in Pennsylvania, a plaintiff must demonstrate the following elements: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of such benefit by the defendant; and (3) acceptance and retention of such benefit under circumstances such that it would be inequitable for the defendant to retain the benefit without payment to the plaintiff. AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa. Super. Ct. 2001); see also Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 447 (3d Cir. 2000). "The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." AmeriPro, 787 A.2d at 991. Instead, "a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that . . . would be unconscionable for her to retain." Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 180 (3d Cir. 2008) (quoting Torchia v. Torchia, 499 A.2d 581, 582 (Pa. Super. Ct. 1985)). In this case, A&M argues only that the third element has not been satisfied, and we proceed directly to it.

Relying on Joint Exhibit 25 and Defendants' Exhibit 1, the District Court found as fact that A&M had disbursed a total of $2,752,329.00 to the various parties providing services and materials under the Contract. JA 54, 63-64. Comparing that figure to the adjusted Contract price of $2,537,935.22, the District Court found that A&M had made payment in excess of its contractual obligation. JA 64-65. Citing Meyers Plumbing & Heating Supply Co. v. West End Federal Savings & Loan Ass'n, 498 A.2d 966 (Pa. Super. Ct. 1985), the court then held that since A&M had made such excess payments, it could not have been "unjustly" enriched. In the District Court's words, requiring A&M to "pick up Clark's tab and pay twice for the same goods" would itself be an inequitable result. JA 68.

In Meyers, a subcontractor brought suit against two owners and their general contractor when the owners discontinued payment to the general contractor due to a contractual dispute. 498 A.2d at 967. As is relevant here, the subcontractor had sold to the general contractor, but had not yet been paid for, certain plumbing and heating materials that were then provided to the owners. Id. The

30

Superior Court affirmed the trial court's grant of summary judgment with respect to the subcontractor's unjust enrichment claim against the owners, because the owners had already disbursed payments totaling 96.5% of the original Contract price. Id. at 969. Under these circumstances, the Superior Court held that the benefit conferred was not unjust: "[T]o require [the owners] to pay [the subcontractor] in this action would obligate them to pay for the same items twice. As a result of the money having already been paid once, it can hardly be said that the owners' 'enrichment' from the plumbing and heating materials is unjust." Id.

State Steel does not challenge the District Court's legal analysis or its reliance on Meyers, with which we entirely agree. It instead attacks the key factual finding underlying the analysis: that A&M paid in the aggregate more than the adjusted Contract price. State Steel complains that by granting the Rule 52(c) motion, the District Court did not afford it an opportunity to challenge Defendants' Exhibit 1. Specifically, State Steel claims that it acquiesced to the exhibit's admission "only as to authenticity," but that due to the Rule 52(c) motion, it never had the opportunity to cross-examine A&M's witnesses on the accuracy of that evidence. State Steel Reply Br. at 8. Because Defendants' Exhibit 1 "does not contain copies of cancelled checks or bank records," it says, "the documents which purport to represent payment are nothing more than unsubstantiated records of [A&M]." State Steel Br. at 34. Accordingly, State Steel argues that "the District Court committed reversible error when it granted [A&M's Rule 52(c) motion] and did not require [A&M] to present evidence or testimony regarding State Steel's claims . . . ." State Steel Reply Br. at 1-2. We disagree.

We do not understand State Steel to argue that it was not "fully heard" on its claim for unjust enrichment, rendering a Rule 52(c) disposition unavailable.[23] Instead, we understand it to

---

[23] If that is its contention, we reject it. Having rested its case, State Steel was heard fully on its two remaining causes of action. State Steel's tactical decision to permit the admission of A&M's exhibits without objection, and its failure to adduce

challenge the District Court's key factual finding as clearly erroneous because A&M did not present testimony corroborating Joint Exhibit 25 and Defendant's Exhibit 1. This, it says, precluded it from cross-examining A&M's witnesses in the hopes of undermining the reliability of the exhibits. Unapparent to us, however, is any reason why A&M would shoulder an affirmative burden to introduce testimony for the sole purpose of allowing State Steel an opportunity to deconstruct the documentary evidence. To the contrary, Rule 52 and the Supreme Court instruct us to review factual findings for clear error, no matter the character of the evidence cited in support:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. . . . This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts. . . . Rule 52(a) does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous.

Bessemer City, 470 U.S. at 573-74 (quotation marks and citations omitted); see also Fed. R. Civ. P. 52(a)(6) (prescribing clear-error review "whether based on oral or other evidence").

The burdens of production and persuasion rested entirely with State Steel to establish its claim, see Torchia, 499 A.2d at 582, and therefore A&M need not have presented any evidence at all. If State Steel desired to examine A&M's employees with respect to payments allegedly made, it should have called those witnesses

---

additional testimony enabling it to challenge that evidence, cannot be ascribed as the failure of the District Court to ensure that it had been "fully heard."

during its case-in-chief (as it did with Fox[24]). Alternatively, if it was ill-prepared to challenge the documentary evidence using the testimony of the witnesses that it did call, it should not have stipulated to admission of the documents during its case-in-chief. Either way, State Steel cannot now attack the District Court's factual findings as a product of the court's "failure" to force A&M to proffer unnecessary testimony. We find neither an abuse of discretion in the District Court's reliance on the documents nor clear error in its finding that A&M disbursed more than the Contract price. We will affirm its rejection of the unjust enrichment claim.[25]

B.

Finally, State Steel challenges the District Court's judgment, again made on partial findings, against its claim for fraudulent inducement. In Pennsylvania, fraud-based claims of this sort require proof of the following elements by clear and convincing evidence:

---

[24] Contrary to State Steel's claim that "the record is devoid of any testimony concerning the invoices and payment records submitted by" A&M, State Steel Br. at 33, Fox did indeed testify that Joint Exhibit 25 was "a summary of all of the payments that were made in connection with the reconstruction of the A&M compost building . . . ." JA 246. This testimony, which the District Court found credible, supports reliance on the documentary evidence despite State Steel's claim that no such testimony exists.

[25] An unjust enrichment claim in Pennsylvania is still viable in this context if the owner misled the subcontractor into providing a benefit. See D.A. Hill Co. v. CleveTrust Realty Investors, 573 A.2d 1005, 1009 (Pa. 1990); Limbach Co., LLC v. City of Phila., 905 A.2d 567, 577 (Pa. Commw. Ct. 2006). The District Court correctly went on to examine whether State Steel proved that A&M misled it into providing the raw steel to Clark, and concluded that it had not. JA 65-67. Specifically as to the claim for unjust enrichment, State Steel makes no mention to us of this additional finding, and we do not address it.

(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Skurnowicz v. Lucci, 798 A.2d 788, 793 (Pa. Super. Ct. 2002) (quoting Bortz v. Noon, 729 A.2d 555, 560 (Pa. 1999)); see also Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 771 (3d Cir. 2009); Overall v. Univ. of Pa., 412 F.3d 492, 498 (3d Cir. 2005). "Matters of misrepresentation, knowledge, reliance, causation, and scienter are questions of fact" subject to clear-error review. Healey v. Chelsea Res., Ltd., 947 F.2d 611, 618 (2d Cir. 1991) (citing Fed. R. Civ. P. 52(a)); accord Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 229 (3d Cir. 2007) (citing Healey).

State Steel argues that the following statement in the Fox Letter was a material misrepresentation, and induced it to continue delivering steel to Clark: "With respect to any balance that Clark may owe your company . . . , [our] company is willing, with Clark's permission, to pay you directly or by joint check made payable to Clark and your company . . . ." JA 308-09. Though a material representation, the District Court found that this statement was not a misrepresentation. Absent such a false statement, the court also found lacking an intent to mislead, justifiable reliance, and proximate causation of damages. JA 71-74. Reviewing the District Court's evaluation of the factual evidence and its credibility determinations[26] underlying its conclusion, we find no

_____

[26] The District Court found Wansor's testimony to be generally not credible, and Smith's testimony to be contradicted by the evidence on several key points. JA 37-38. It also found Fox to be credible despite an inconsistent statement he had made in his deposition. JA 38 & n.7. Finally, the court found Chizek's testimony to be credible generally, but noted an "important discrepancy" and also stated that she had an "inherent bias" against A&M given her role with State Steel. JA 38-39. State Steel

34

clear error.

Chizek testified at trial that she understood the Fox Letter to be a guarantee that A&M "would take care of our invoices." JA 266. Additionally, Fox admitted that his letter did not refer to the balance in the joint checking account (perhaps tending to demonstrate that A&M's payments to State Steel would not be limited by the funds in that account), or state specifically that A&M would not pay State Steel once it had fully paid the Contract price. JA 248-49. State Steel emphasizes these points, and argues that the trial testimony, along with Fox's October 7, 2004 letter (indicating to Wansor that A&M would pay the subcontractors as discussed in his "earlier letters") established a material misrepresentation. Though a plausible conclusion, we do not agree that it is the only permissible one.

The District Court took these considerations into account, but found that the Fox Letter did not misrepresent that A&M guaranteed to satisfy State Steel's invoices if Clark failed to do so. The court believed Chizek's earlier deposition testimony – that she would not have expected A&M to pay more than the Contract price (despite the letter's failure to say so) – to be a reliable indicator of the true meaning of the Fox Letter. JA 72. Chizek's earlier belief is corroborated by Fox's trial testimony that A&M would "make direct payments as long as [it] c[ould] deduct them against what [it] owe[d] Clark," but that "by definition, we are not going to make payments if we don't owe Clark any more money." JA 249. The court also credited Fox's testimony that he drafted the letter at Clark's request, that A&M never received an invoice from State Steel, that he had no prior dealings with State Steel, and that he

challenges this last point as clear error because the District Court did not make a corresponding finding with respect to Fox's position at A&M. State Steel Br. at 30. We take the District Court at its word, however, and review its analysis keeping in mind that it found Chizek's testimony to be credible except where it specifically noted otherwise. We find no internal inconsistency with the court's credibility determinations, and we credit them accordingly.

"wouldn't know State Steel from the man on the moon." JA 72-73, 250. This lack of a historical relationship between Fox and State Steel undercuts an interpretation that the Fox Letter contained an unqualified and false promise to guarantee payment.

Further, the District Court found that the "earlier letters" that Fox had referenced in his October 7 correspondence did not reference the Fox Letter or guarantee direct payment to all subcontractors, but only did so as to the mitigation subcontractors retained after Clark fell behind schedule. JA 72 n.16. This reading is not clearly erroneous. At bottom, the District Court read the Fox Letter as merely "seek[ing] to establish a process by which payment could be made," rather than "obligat[ing] [A&M] as a guarantor of the agreement between Clark and [State Steel]." JA 73. Since this is precisely the manner in which A&M conducted itself, the court found no misrepresentation in the Fox Letter.

Under all of these circumstances, we conclude that the record evidence supported the District Court's interpretation of the Fox Letter as an administrative proposal to streamline payments, and nothing more. The District Court did not clearly err in finding that State Steel had failed to prove a material misrepresentation by clear and convincing evidence. Consequently, it did not err in rendering judgment under Rule 52(c) on the claim for fraudulent inducement.

IV.

For these reasons, we will affirm the judgment of the District Court in all respects.